# EXHIBIT A

VICTORIA HEIGHTS, LTD.

A CALIFORNIA LIMITED PARTNERSHIP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

DATED EFFECTIVE AS OF AUGUST 27, 2001

NewD\Victoria Heights\LP.6

CB__PARTNERSHIP AGREEMENT; 8-27-01_104

EXHIBIT
0054

JAE-AMTA

## TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| Preliminary Statement | | 1 |
| ARTICLE I | | 1 |
| Defined Terms | | 1 |
| ARTICLE II | | 17 |
| Continuation; Name; Purpose and Term | | 17 |
| Section 2.1 | Continuation | 17 |
| Section 2.2 | Name and Office; Agent for Service | 17 |
| Section 2.3 | Purpose | 17 |
| Section 2.4 | Authorized Acts | 18 |
| Section 2.5 | Term and Dissolution | 19 |
| ARTICLE III | | 19 |
| Financing and Disposition of Property | | 19 |
| ARTICLE IV | | 20 |
| Partners; Capital | | 20 |
| Section 4.1 | General Partner | 20 |
| Section 4.2 | Limited Partners | 20 |
| Section 4.3 | Partnership Capital and Capital Accounts | 21 |
| Section 4.4 | Liability of Limited Partners | 22 |
| Section 4.5 | Certain Rights of Investor Limited Partner | 22 |
| ARTICLE V | | 25 |
| Capital Contributions of Investor Limited Partner | | 25 |
| Section 5.1 | Installments of Capital Contributions | 25 |
| Section 5.2 | Adjustments to Capital Contributions | 27 |
| ARTICLE VI | | 29 |
| Distributions of Cash; Allocations of Profits, Losses and Tax Credits | | 29 |
| Section 6.1 | Profits and Losses and Tax Credits | 29 |
| Section 6.2 | Application and Distribution Prior to Dissolution | 30 |
| Section 6.3 | Liquidation | 32 |
| Section 6.4 | Special Allocation Provisions | 33 |
| Section 6.5 | Order of Application | 35 |
| ARTICLE VII | | 36 |
| Rights, Powers and Duties of the General Partners | | 36 |
| Section 7.1 | Restrictions on Authority | 36 |
| Section 7.2 | Independent Activities | 37 |
| Section 7.3 | Business Management and Control; Designation of Managing General Partner | 37 |
| Section 7.4 | Duties and Obligations of the General Partners | 39 |
| Section 7.5 | Representations and Warranties; Certain Indemnities | 42 |
| Section 7.6 | Indemnification | 45 |
| Section 7.7 | Liability of General Partners to Limited Partners | 46 |
| Section 7.8 | Reserves | 46 |
| Section 7.9 | Obligation To Provide for Project Expenses | 47 |
| Section 7.10 | Certain Payments to the General Partners and Affiliates | 47 |

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710002

JAE-AMTAX00000293

Section 7.11   Several Obligations..............................................................49
Section 7.12   Grant of Security Interest.....................................................49
Section 7.13   Tax Matters Partner..............................................................50
Section 7.14   Special Limited Partner.........................................................51
ARTICLE VIII...............................................................................................51
Withdrawal of a General Partner; New General Partners....................................51
Section 8.1   Voluntary Withdrawal............................................................51
Section 8.2   Right To Continue..................................................................52
Section 8.3   Successor General Partner.......................................................52
Section 8.4   Interest of Predecessor General Partner....................................52
Section 8.5   Designation of New General Partners.......................................54
Section 8.6   Amendment of Certificate; Approval of Certain Events ...............54
Section 8.7   Admission of a General Partner................................................54
ARTICLE IX.................................................................................................55
Transfer of Limited Partner Interests; Additional Limited Partners......................55
Section 9.1   Right To Assign.....................................................................55
Section 9.2   Restrictions...........................................................................55
Section 9.3   Substitute Limited Partners.....................................................55
Section 9.4   Assignees..............................................................................56
Section 9.5   Additional Limited Partners.....................................................57
ARTICLE X..................................................................................................57
Loans..........................................................................................................57
ARTICLE XI.................................................................................................57
Management Agent.......................................................................................57
ARTICLE XII................................................................................................59
Books and Reporting, Accounting, Tax Elections, Etc. .....................................59
Section 12.1   Books, Records and Reporting................................................59
Section 12.2   Bank Accounts.....................................................................62
Section 12.3   Elections.............................................................................62
Section 12.4   Special Adjustments..............................................................63
Section 12.5   Fiscal Year ..........................................................................63
ARTICLE XIII...............................................................................................63
General Provisions........................................................................................63
Section 13.1   Notices ...............................................................................63
Section 13.2   Word Meanings....................................................................63
Section 13.3   Binding Provisions................................................................64
Section 13.4   Applicable Law.....................................................................64
Section 13.5   Counterparts........................................................................64
Section 13.6   Paragraph Titles...................................................................64
Section 13.7   Separability of Provisions; Rights and Remedies ......................64
Section 13.8   Effective Date of Admission..................................................65
Section 13.9   Amendment Procedure..........................................................65
Section 13.10  Delivery of Certificate ..........................................................66
Section 13.11  Requirements of the Lender and the Agency............................66
Section 13.12  Entire Agreement.................................................................67
Section 13.13  Partition.............................................................................69

CB__ PARTNERSHIP AGREEMENT; 8-27-01_104710003

JAE-AMTAX00000294

Section 13.14  Representation of Parties ......................................................... 70
Section 13.15  Arbitration ................................................................................. 70
Section 13.16  Requirements for Bonds .......................................................... 73
ARTICLE XIV ................................................................................................. 73
Section 14.1  Authorization and Execution of Documents ............................. 73
Section 14.2  Business of Partnership ............................................................. 74
Section 14.3  Conflicts .................................................................................... 74
Section 14.4  Liability of Partners under Regulatory Agreement ................... 74
Section 14.5  Transfers of Partnership Interests ............................................. 75
Section 14.6  Dissolution ................................................................................ 75
Section 14.7  Compensation and Distributions of Project Funds ................... 75
Section 14.8  Designation of Authorized Representative ............................... 76
Section 14.9  Amendments .............................................................................. 77
Section 14.10  Automatic Termination ............................................................ 77

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710004

JAE-AMTAX00000295

## VICTORIA HEIGHTS, LTD.

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP OF VICTORIA HEIGHTS, LTD., a California limited partnership, dated effective as of August 27, 2001, among CENTRAL VALLEY COALITION FOR AFFORDABLE HOUSING, a California nonprofit corporation, as Managing General Partner; JAE PROPERTIES, INC., a California corporation, as Co-General Partner; PROTECH 2001-B, LLC, an Ohio limited liability company ("PROTECH"), as Special Limited Partner; MANFORD FORKNER, as Original (and Withdrawing) Limited Partner and AMTAX HOLDINGS 2001-XX, LLC, an Ohio limited liability company ("AMTAX"), as Investor Limited Partner.

### Preliminary Statement

The Partnership was organized as a partnership in the laws of the State of California pursuant to a Certificate of Limited Partnership dated February 2, 2000 (the "Certificate") and Agreement of Limited Partnership dated as of February 1, 2000 (the "Limited Partnership Agreement") the Certificate having been filed with the Secretary of State of California (the "Filing Office") on February 14, 2000.  The Limited Partnership Agreement is herein collectively called the "Original Partnership Agreement."

WHEREAS, in furtherance of the Managing General Partner's charitable purposes of providing low income housing to needy and distressed persons, the Managing General Partner has entered into the Partnership to acquire, develop, construct, rehabilitate, own and maintain an 150 unit multi-family apartment complex intended for rental to persons of low and moderate income to be known as LINCOLN APARTMENTS and to be located in Riverside, California (the "Apartment Complex").  The Managing General Partner has selected the Co-General Partner and the Investor Limited Partner as the Partners with whom it wishes to develop the Project, as described herein.  In addition to the Co-General Partner and the Investor Limited Partner, the Managing General Partner on behalf of the Partnership has selected and approves and agrees to oversee the Developer, the Accountants and the Property Management Agreement as part of the Partnership development and ongoing management team; and

The purposes of this amendment to, and restatement of, the Original Partnership Agreement are (i) to enable the Partnership to admit Protech as Special Limited Partner and AMTAX as the Investor Limited Partner, (ii) to provide for the withdrawal of the Original Limited Partner as Limited Partner and (iii) to set out more fully the rights, obligations and duties of the Partners.

Now, therefore, it is agreed and certified, and the Original Partnership Agreement is hereby amended and restated in its entirety, as follows:

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710005

JAE-AMTAX00000296

# ARTICLE I
# DEFINED TERMS

The defined terms used in this Agreement shall have the meanings specified below:

"Accountants" means Novogradac or other firm of independent certified public accountants to be engaged by the Managing General Partner with the Consent of the Investor Limited Partner for the purpose of reviewing, preparing, and certifying various reports as required by this agreement or by applicable government agencies.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of a Partnership Fiscal Year, after giving effect to the following adjustments:

        (i)      Such Capital Account shall be increased by the amount of any Deficit Restoration Obligation of such Partner.

        (ii)     Such Capital Account shall be decreased by the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Allocation Regulations.

The foregoing definition of Adjusted Capital Account Deficit and the application of such term in the manner provided in Article IV hereof is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Allocation Regulations and shall be interpreted consistently therewith.

"Admission Date" means the date on which AMTAX is admitted to the Partnership as the Investor Limited Partner pursuant to Section 13.8.

"Affiliate" or "Affiliated Person" means, when used with reference to a specified Person: (i) any Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the specified Person; (ii) any Person that is an officer of, partner in, or trustee of, or serves in a similar capacity with respect to the specified Person or of which the specified Person is an officer, partner, or trustee, or with respect to which the specified Person serves in a similar capacity; (iii) any Person that, directly or indirectly, is the beneficial owner of, or controls, 10% or more of any class of equity securities of, or otherwise has a substantial beneficial interest (10% or more) in, the specified Person, or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities, or in which the specified Person has a substantial beneficial interest (10% or more); and (iv) any relative or spouse of the specified Person. Affiliate or Affiliated Person of the Partnership or a General Partner does not include a Person who is a partner in a partnership or joint venture with the Partnership (or any other Affiliated Person) if that Person is not otherwise an Affiliate or Affiliated Person of the Partnership or General Partner.

"Agency" means, as applicable, the Authority and/or any other government agency having jurisdiction over the particular matter to which reference is being made.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710006

JAE-AMTAX00000297

"Agreement" means this Amended and Restated Agreement of Limited Partnership, as amended from time to time.

"Allocation Regulations" means the Treasury Regulations issued under Sections 704(b) and 752 of the Code, as the same may be modified or amended from time to time. In the event that the Allocation Regulations are revised or amended subsequent to the date of this Agreement, references herein to sections or paragraphs of the Allocation Regulations shall be deemed to be references to the applicable sections or paragraphs of the Allocation Regulations as then in effect.

"AMTAX" means AMTAX HOLDINGS 2001-XX, LLC, an Ohio limited liability company, and its successors.

"Apartment Complex" means the Buildings of the Project comprising the Partnership.

"Asset Management Fee" means the annual cumulative fee in an amount of equal to 0.6% of the Investor Limited Partner's Capital Contribution (as adjusted annually by the C.P.I.), payable by the Partnership to the Manager of the Investment Company, or an affiliate thereof, for its services in monitoring Partnership activities. Such fee shall be payable from Cash Flow as set forth in Section 6.2, provided, however, that if there is insufficient Cash Flow in any year, the Co-General Partner shall make a Subordinated Loan to the Partnership to enable the Partnership to pay the fee currently. Should the Co-General Partner fail to make Subordinated Loans to pay such fee, any such fee not payable currently due to insufficient Cash Flow shall accrue and be payable from subsequent years' Cash Flow and Capital Proceeds as set forth in Section 6.2.

"Assignment" shall mean any assignment, transfer or sale, and the words "assign," "assignee" and "assignor" shall have correlative meanings, except in each case where the sense of this Agreement requires a different construction.

"Auditors" means a firm of independent certified accountants as may be engaged by the Managing General Partner, for the purpose of reviewing, preparing, certifying various reports as required by this Agreement or by applicable government agencies.

"Authority" means the California Tax Credit Allocation Committee.

"Bonds or Bond Documents" means the Aaa-rated tax-exempt bonds issued by California Statewide Communities Development Authority and all documents relating to the tax exempt bonds in an amount not to exceed $5,425,000, with a 35 year term, 35 year amortization and an average bond interest rate of up to 5.78% and a debt service coverage ratio not less than 1.20.

"Breakeven" means the date upon which the income from the operation of the Apartment Complex and all other income from the operation of the Partnership received on a cash basis (other than any governmental subsidies which shall be deemed received on the accrual basis), and all proceeds from business interruption or rental insurance for a period of three (3) consecutive calendar months after the Final Closing, equals or exceeds all then payable and accrued operational costs (provided however that any expenses or costs of a seasonal nature

CB__ PARTNERSHIP AGREEMENT; 8-27-01_104710007

JAE-AMTAX00000298

which might reasonably be expected to be incurred unevenly shall be amortized on an annual basis as determined by the Accountants) of the Apartment Complex, including but not limited to taxes, assessments, reserve fund deposits and debt service payments (but excluding the Asset Management Fee and the Partnership Management Fee) for such period of three (3) consecutive calendar months, with each month viewed individually against accrued operational costs on an annualized budget basis as approved by the Investor Limited Partner. The determination that Breakeven has occurred shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; provided, however, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within fifteen (15) business days after having received the Accountants' determination letter, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement and Breakeven shall be deemed to have occurred.

"Builder" means Bay Construction Company and/or its agents.

"Buildings" means the building or buildings located on the Land, which, in the aggregate, are to contain upon completion of construction 150 apartment dwelling units.

"Business Days" means the days of the week, Monday through Friday, for which business is normally conducted in the United States. It does not include national holidays, but does include state and local holidays.

"Capital Account" means, with respect to any Partner, the Capital Account maintained by the Partnership with respect to such Partner in accordance with the provisions of Section 4.3B.

"Capital Contribution" means the total amount of cash and the Gross Asset Value of any property contributed or agreed to be contributed to the Partnership by each Partner as shown in the Schedule (minus any liabilities secured by such contributed property that the Partnership assumes or takes subject to). Any reference in this Agreement to the Capital Contribution of a then Partner shall include a Capital Contribution previously made by any prior Partner in respect to the Partnership interest of such then Partner.

"Capital Proceeds" means the gross proceeds resulting from any Capital Transaction less the expenses of the Partnership incident to such Capital Transaction, before any application or distribution of such proceeds pursuant to this Agreement.

"Capital Transaction" means any transaction the proceeds of which are not includable in determining Cash Flow, including without limitation the sale, refinancing or other disposition of all or substantially all of the assets of the Partnership, but excluding loans to the Partnership (other than a refinancing of any Mortgage Loan) and contributions of capital to the Partnership by the Partners.

"Cash Flow" means, with respect to any Fiscal Year or applicable period, (a) all cash receipts of the Partnership from operations, subsidy payments or rental interruption insurance recoveries received by the Partnership during such period; plus (b) any interest or like earnings of the Partnership and any amounts which the General Partner releases upon approval of

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710008

JAE-AMTAX00000299

Investor Limited Partner from any Partnership reserve as being no longer necessary to hold as part of such reserve, less (i) cash funds used to pay Project Expenses of the Partnership during the period, including any fees and expenses paid to the Manager of the Investor Limited Partner or the General Partners (other than the Asset Management Fee and the Partnership Management Fee), (ii) all cash payments during such period to discharge Partnership indebtedness (other than Subordinated Loans), and (iii) any amounts added to Partnership reserves (other than Operating Reserves) during such period.

"Certificate" means the certificate of limited partnership of the Partnership as amended from time to time in accordance with the terms hereof.

"Change of Control" means, in any one or series of transactions: (i) in the case of a corporation, a sale, transfer, assignment or other disposition of fifty percent (50%) or more of the voting stock of the corporation or a change in the majority of directors of the board of directors of the corporation; (ii) in the case of a partnership, a sale, transfer, assignment or other disposition of a general partner's interest in the partnership or, in addition, in the case of a corporate general partner, a sale, transfer, assignment or other disposition as set out in (i) herein; (iii) in the case of a limited liability company, a sale, transfer, assignment or other disposition of the managing member's interest in the limited liability company, or, in addition, in the case of a corporate managing member, a sale, transfer, assignment or other disposition as set out in (i) herein, or, in the case of more than one managing member (or if all members share management or non-member managers), any change in the majority of members; or (iv) in the case of any other entity, a change substantially in effect as set forth in (i) through (iii) herein, to the extent applicable.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder at the time of reference thereto.

"Commitments" means and includes, collectively, the Mortgage Loan Commitments, and any documents and other instruments delivered to or required by the Lender or the Agency by or from the Partnership in connection with any of such Commitments, the Mortgage Loan[s] or the Project, as amended from time to time.

"Completion Date" means the later of (i) the date on which AMTAX shall have received copies of all requisite certificates or permits permitting occupancy of 100% of the apartment units in the Project as issued by each governmental agency having jurisdiction; provided, however, that if such certificates or permits are of a temporary nature, the "Completion Date" shall not be deemed to have occurred unless that work remaining to be done is of nature which would not impair the permanent occupancy of any of such apartment units; or (ii) date as of which the Inspecting Architect certifies that the work to be performed by the Builder under the Construction Contract is substantially complete in conformity with any existing building code requirements. Any representation by a General Partner under this Agreement that the Completion Date has occurred shall be subject to confirmation by the Investor Limited Partner pursuant to a physical inspection of the Property; provided, however, that in the event that the Investor Limited Partner does not make such physical inspection of the Property within 15 business days after having received any such General Partners' representation, then the Investor Limited Partner will be deemed to have waived the physical inspection requirement.

New D\Victoria Heights\LP.6

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710009

JAE-AMTAX00000300

"Consent of the Investor Limited Partner" means the prior written consent or approval of the Investment Company, or, if at any time there is more than one Investor Limited Partner, the prior written consent or approval of at least 51% in interest of the Investor Limited Partners.

"Construction Contract" means the construction contract between the Partnership and the Builder providing for the construction of the Improvements in accordance with the Commitments, as amended from time to time.

"Consumer Price Index or C.P.I." means the Consumer Price Index for All Urban Consumers, All Cities, for All Items (base 1982-84 = 100) published by the United States Bureau of Labor Statistics. In the event such index is not in existence when any determination relying on such index under this Agreement is to be made, the most comparable governmental index published in lieu thereof shall be substituted therefor.

"Cost Certification" means the date upon which the Investment Company has received a certification by the Managing General Partner of the construction and development costs of the Apartment Complex and the Eligible Basis of the Apartment Complex for purposes of Tax Credits, together with a report thereon issued by the Auditors in a form and substance as approved by Investment Company.

"Co-General Partner" means JAE Properties, Inc., a California corporation.

"Credit Agency" means the Authority.

"Credit Deficiency" shall mean when there has been a Final Determination for each calendar year of the difference between the Projected Credit (or adjusted Projected Credit if a Credit Shortfall that occurred previously has already been taken into account and an adjustment to the Projected Credit has been made) and the amount of the Tax Credit actually available to the Investor Limited Partner for the calendar year. Tax Credits actually available for any such year shall not offset or reduce the Credit Deficiency for any prior or subsequent year.

"Credit Period" means the period of ten (10) years beginning with the taxable year in which the Project is placed in service or, if an election has been made pursuant to Section 42(f)(1) of the Code to defer the commencement of the Credit Period, and the Consent of the Investor Limited Partner obtained, the succeeding taxable year.

"Credit Recovery Loan" has the meaning set forth in Section 5.2C.

"Credit Shortfall" shall mean the difference, as of the Completion Date and based upon the Cost Certification, between the Maximum Annual Credit and the amount of annual Tax Credits for which the Property will be eligible.

"Debt Coverage Date" means the first day following a period of six (6) consecutive calendar months commencing on or after Final Closing during each of which, as determined by an accountant, the Project has produced income (as computed under the definition of Breakeven) after payment of all cash requirements other than debt service on the Permanent Mortgage Loan and satisfaction of all reserve requirements (in each case as described under the

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710010

JAE-AMTAX00000301

definition of Breakeven) at least equal to 1.15 times the amount of the required monthly debt service, including mortgage insurance premiums, if any, on the Permanent Mortgage Loan.

"Deficit Restoration Obligation" means, for each Partner, the sum of (i) any amounts which such Partner is obligated to restore to the Partnership in accordance with the provisions of Sections 1.704-1(b)(2)(ii)(c), 1.704-1(b)(2)(ii)(h) or any other applicable provisions of the Allocation Regulations, (ii) such Partner's Share of Partnership Minimum Gain if any, and (iii) such Partner's Share of Partner Nonrecourse Debt Minimum Gain, if any.

"Depreciation" means, for the Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis.

"Developer" means JAE Properties, Inc acting in its capacity as developer of the Project.

"Developer Fee" or "Development Fee" means the fees payable to the Developer under the terms of the Developer Agreement and Section 7.10G of this Agreement.

"Development Agreement" means the Development Agreement of even date herewith between the Partnership and the Developer.

"Development Advances" has the meaning set forth in the Development Agreement.

"Development Amount" has the meaning set forth in the Development Agreement.

"Eligible Basis" shall mean the adjusted basis of the Project as determined under Section 42(d) of the Code.

"Entity" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, cooperative or association.

"Event of Bankruptcy" means, as to a specified Person:

(i)     The entry of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or ordering the winding-up or liquidation of his affairs and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710011

JAE-AMTAX00000302

(ii)     The commencement by such Person of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by him to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of such Person or for any substantial part of his property, or the making by him of any assignment for the benefit of creditors, or the failure of such Person generally to pay his debts as such debts become due, or the taking of action by such Person in furtherance of any of the foregoing.

"Extended Use Agreement" means the Extended Low-Income Housing Covenant for Low-Income Housing Tax Credits required pursuant to Section 42(h) of the Code to be executed by the Partnership and delivered to the Agency setting forth certain terms and conditions under which the Apartment Complex is to be operated.

"Facility" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

"Federal Housing Tax Credit" means the low-income housing tax credit authorized by Section 42 of the Code.

"Filing Office" has the meaning given it in the Preliminary Statement of this Agreement.

"Final Closing" means the date upon which all of the following events have occurred: (i) Permanent Mortgage Commencement, (ii) the Project's being free of any mechanics' or other liens (except for the Mortgage[s] and liens either bonded against in such a manner as to preclude the holder thereof from having any recourse to the Project or the Partnership for payment of any debt secured thereby or affirmatively insured against (in such manner as precludes recourse to the Partnership for any loss incurred by the insurer) by the Title Policy or by another policy of title insurance issued to the Partnership by a reputable title insurance company in an amount satisfactory to Special Investment Company Tax Counsel (or by an endorsement of either such title policy)), and (iii) all amounts due in connection with the construction of the Project have been paid or provided for.

"Final Determination" means the earliest to occur of: (a) the date on which a decision, judgment, decree or other order has been issued by a court of competent jurisdiction and has become final (i.e., all allowable appeals have been exhausted), (b) the date on which the Service has entered into a binding agreement with the Partnership or on which the Service has reached a final administrative determination which whether by law or agreement is not subject to appeal, (c) the date upon which the Partnership's right to institute a claim for refund has lapsed, (d) the date upon the applicable statute of limitations with respect to the Partnership raising the issue has expired, or (e) the date the Accountants have filed a tax return which indicates the manner in which the Partnership is reporting an item.

"General Partner" or "General Partners" means any Person or Persons designated as a General Partner in the Schedule or any Person who becomes a General Partner as provided herein, in such Person's capacity as a General Partner of the Partnership. If at any time the Partnership shall have a sole General Partner, the term "General Partners" shall be construed as singular.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

      (i)     The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the Partnership;

      (ii)    The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times: (a) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership; and (c) the liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations; provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

      (iii)   The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

      (iv)   The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Allocation Regulations and Section 3.04 hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the Managing General Partner determines that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section (i), (ii) or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"Gross Revenues" means total income, revenue (including gross rental income of the Project prior to any reduction or payments for fees, costs and reimbursements to Management

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710013

JAE-AMTAX00000304

Agent), profit, and gain, proceeds from a sale or refinancing of the Property (all as adjusted by refunds and amounts held in escrow, but not by amounts held or placed in reserves) from all sources, including interest, royalties and dividends, whether taxable, nontaxable or exempt form taxation.

"Hazardous Material" shall have the collective meanings given to the terms "hazardous material," "hazardous substances," "hazardous wastes," "toxic substances" and analogous terms in the Hazardous Waste Laws. In addition, the term "Hazardous Material" shall also include oil and any other substance known to be hazardous.

"Hazardous Waste Laws" means and includes the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Resource Conservation and Recovery Act; the Toxic Substances Control Act and any other federal, state or local statutes, ordinances, regulations or by-laws dealing with Hazardous Material, as the same may be amended from time to time and including any regulations promulgated thereunder.

"Improvements" means the Buildings and any related facilities to be constructed and/or rehabilitated in accordance with the Commitments.

"Incentive Supervisory Fee" means the fee payable to the Managing General Partner as provided in Section 7.10D.

"Initial Closing" means the date upon which the Permanent Mortgage Loan was closed and the first proceeds are available for disbursement of the Permanent Mortgage Loan to the Partnership.

"Initial 90% Occupancy Date" means the first date upon which not less than 90% of the apartment units in the Project are or have been leased and are occupied by tax credit Qualified Tenants, under executed Lender approved leases, if any such approval is applicable.

"Initial 95% Occupancy Date" means the first date upon which 95% of the apartment units in the Project are leased to and are occupied by tax credit Qualified Tenants, under executed Lender approved leases, if any such approval is applicable.

"Installment" means the First, Second, Third or Fourth Installment [or any subsequent Installment], as the context may require, of Capital Contributions of the Investor Limited Partner as described in Section 5.1A.

"Interest" means all the interest of a Partner in Cash Flow, Capital Proceeds and other distributions, capital, Profits or Losses, Tax Credits, and otherwise in the Partnership, including all allocations and distributions and all rights under this Agreement, and also shall include such interests and rights of such Partner in any successor partnership formed pursuant to this Agreement.

"Invested Amount" means (i) as to AMTAX, an amount equal to the Capital Contribution of AMTAX paid pursuant to Section 5.1 hereof divided by .87 and reduced by any distributions of Cash Flow and/or other Capital Proceeds and/or other distributions and other returns of capital (including Section 5.2 payments), and (ii) as to any other Partner, an amount

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710014

JAE-AMTAX00000305

equal to its Capital Contribution actually paid, reduced by any distributions or any returns of capital (including Section 5.2 payments).

"Investment Closing" means the date of execution and delivery of this Agreement.

"Investment Company" means AMTAX.

"Investment Company Agreement" means the Operating Agreement of AMTAX as amended from time to time.

"Investment Limited Partner" means, initially, AMTAX and shall include any other Persons admitted as Investor Limited Partners and their successors in such capacity.

"Investor Limited Partner" means, initially, AMTAX and shall include any other Persons admitted as Investor Limited Partners and their successors in such capacity.

"Land" means the parcels of land on which the Improvements known as Lincoln Apartments are located in Riverside, California.

"Lender" means the Permanent Lender.

"Limited Partner" or "Limited Partners" mean any or all of those Persons designated as Limited Partners in the Schedule, any Person admitted as a Limited Partner pursuant to Section 9.5, or any Person who becomes a Substitute Limited Partner as provided herein, in each such Person's capacity as a Limited Partner of the Partnership.

"Low Income Unit" means any of the 150 dwelling units in the Project and which are to be held for occupancy by the Partnership in such manner as to qualify such units as qualified low-income housing units under Section 42(i)(3) of the Code.

"Management Agent" means JAE PROPERTIES, INC., or any successor thereto as the management agent for the Project.

"Management Agreement" means the management contract or agreement by and between the Partnership and the Management Agent which has received all Requisite Approvals.

"Management Fee" means the amount payable from time to time by the Partnership to the Management Agent for management services in accordance with the Management Agreement, which shall be subject to any Requisite Approvals.

"Managing General Partner" means Central Valley Coalition for Affordable Housing, a California nonprofit corporation or any other Managing General Partner designated as provided in this Agreement.

"Maximum Annual Credit" shall mean an aggregate $236,019 per year, for the Partnership for the total Credit Period, as provided in the Tax Credit Reservation.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710015

JAE-AMTAX00000306

"Minimum Set-Aside Test" means the set aside test selected by the Partnership pursuant to Section 42(g) of the Code whereby at least 40% of the units in the Apartment Complex must be occupied by individuals with incomes equal to 60% or less of area median income, as adjusted for family size.

"Mortgage" means any mortgage indebtedness of the Partnership evidenced by any Note and secured by any mortgage on the Property from the Partnership to any Lender; and, where the context admits, "Mortgage" shall mean and include any of the mortgages securing said indebtedness and any other documents pertaining to said indebtedness which were required by the Lender as a condition to making such Mortgage Loan. In case any Mortgage is replaced by any subsequent mortgage or mortgages, such term shall refer to any such subsequent mortgage or mortgages. The term "mortgage" means any mortgage, mortgage deed, deed of trust, deed to secure debt or any similar security instrument, and "foreclose" and words of like import include the exercise of a power of sale under a mortgage or comparable remedies.

"Mortgage Loan" means a loan made pursuant to a Mortgage Loan Commitment and secured by a Mortgage.

"Mortgage Loan Commitments" means and includes the commitment of the (i) the Permanent Lender to make the Permanent Mortgage Loan utilizing tax exempt bonds, in an amount not to exceed $5,425,000, with a 35 year term, 35 year amortization and an all-in fixed interest rate of approximately 5.78% and a debt service coverage ratio not less than 1.20 and (i) the Seller Financing in an amount not to exceed $600,000 with not less than a 30-year term and an interest rate of up to 6% and payments of interest only as available from Cash Flow, after all operator expenses, reserves, payments due on the Permanent Mortgage Loan and Asset Management Fee. Any unpaid accrued interest and the principal balance outstanding at the time of Sale or Refinancing shall be repaid in accordance with Section 6.2 B herein.

"Note" means and includes any Note from the Partnership to a Lender evidencing a Mortgage Loan, and shall also mean and include any note supplemental to said original note issued to a Lender or any note issued to a Lender in substitution for any such original note.

"Original Partnership Agreement" has the meaning specified in the Preliminary Statement.

"Partner" means any General Partner or Limited Partner.

"Partner Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Allocation Regulations.

"Partner Nonrecourse Debt Minimum Gain" has the meaning set forth in Sections 1.704-2(i)(2) and (3) of the Allocation Regulations.

"Partner Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i)(1) of the Allocation Regulations.

"Partnership" means the Limited Partnership governed by this Agreement as said limited partnership may from time to time be constituted.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710016

JAE-AMTAX00000307

"Partnership Agreement" means this Amended and Restated Agreement of Limited Partnership wherein the Investment Company is admitted to the Partnership as a limited partner.

"Partnership Counsel" means Michaud and Hoshiyama, a law corporation, San Francisco, CA, or such other counsel as the Managing General Partner may designate from time to time as counsel for the Partnership.

"Partnership Management Fee" has the meaning set forth in Section 7.10C.

"Partnership Minimum Gain" has the meaning set forth in Section 1.704-2(d) of the Allocation Regulations.

"Payment Certificate" has the meaning given it in Section 5.1B(i).

"Penalty Payment" has the meaning set forth in Section 5.2(c).

"Permanent Lender" means the maker of the Permanent Mortgage Loan, together with its successors and assigns in such capacity.

"Permanent Mortgage Commencement" means the first date on which the full amount of principal of the Permanent Mortgage Loan has been released to the Partnership.

"Permanent Mortgage Loan" means the Permanent Mortgage Loan utilizing Aaa-rated tax exempt bonds in an aggregate amount not to exceed approximately $5,425,000, with a 35 year term, 35 year amortization and an all-in fixed interest rate of approximately 5.78% and a debt service coverage ratio no less than 1.20 and the Seller Financing in an amount not to exceed $600,000, with no less than a 30-year term, an interest rate of approximately 6.00%. The loans will be non-recourse to the Partners.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits.

"Profits or Losses" means, for each Fiscal Year or other period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

    (i)    Any items described in Sections 705(a)(1)(B) and 705(a)(1)(C) of the Code which are not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss.

    (ii)    Any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Allocation Regulations, and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or loss.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710017

JAE-AMTAX00000308

(iii)    Gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(iv)    In the event of a distribution of Partnership assets to a Partner (whether in connection with a liquidation or otherwise), or in the event the Gross Asset Value of any Partnership asset is adjusted upon the acquisition of an additional interest in the Partnership, unrealized income, gain, loss and deduction inherent in such distributed or adjusted assets (not previously reflected in Capital Accounts) shall be allocated pursuant to Section 6.1 hereof as if there had been a taxable disposition of such distributed or adjusted assets at fair market value.

(v)    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" set forth herein.

(vi)    Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 6.5 hereof shall be taken into account in computing Profits or Losses only if the Accountants determine that such items should be so reflected.

"Profits or Losses from a Capital Transaction" means the Profits or Losses, if any, recognized by the Partnership as a result of a Capital Transaction, as determined for federal income tax purposes by the Accountants, but without regard to any adjustments to basis pursuant to Section 734 and 743 of the Code.

"Project" or "Property" means the Land and the Improvements.

"Project Documents" means and includes the Construction Contract, the Mortgages, the Regulatory Agreement, the Commitments, the Management Agreement and all other documents relating to the Project, which are required by, or have been executed in connection with, any of the foregoing documents.

"Project Expenses" means (i) up to and including the Completion Date, those expenses, properly accruable through such date which may be properly charged as operating expenses of the Project under standard accounting procedures and which are allocable, in accordance with generally accepted accounting principles, to apartment units for which all requisite approvals for occupancy have been obtained; such operating expenses may include real estate taxes and debt service [and mortgage insurance premiums] with respect to the Mortgage Loan[s] (to the extent such operating expenses are not funded out of Capital Contributions or Mortgage Loan Proceeds), but shall not include any costs required to be capitalized in accordance with generally accepted accounting principles; and (ii) after the Completion Date, all the costs and expenses of any type incurred incidental to the ownership and operation of the Project, including, without limitation, taxes, capital improvements reasonably deemed necessary by the

General Partners and not funded out of any reserves for such, [mortgage and bond insurance premiums] and the cost of operations, debt service, maintenance and repairs, and the funding of any reserves required to be maintained by the Lender and the Agency, but shall not include (i) repayments of Subordinated Loans or (ii) distributions to Partners pursuant to Article VI.

"Projected Credit" means Federal Housing Tax Credits on a year-by-year basis in the amount of $228,003 for 2002, $235,783 per year for each of the years 2003 through 2011 and $7,780 for 2012 which the Managing General Partner has projected to be the total amount of the Tax Credits, which such credits will be allocated to the Investment Company by the Partnership, constituting ninety-nine point nine per cent (99.9%) of the total Tax Credits in the aggregate amount of $2,360,190 which are projected to be available to the Partnership. Such Projected Credit will be adjusted to reflect any upward or downward adjustments caused by Section 5.2.

"Purchase Agreement" means the Purchase Agreement of even date herewith pursuant to which the Purchaser has agreed, among other things, to purchase the Interest of the Investor Limited Partner under specified circumstances.

"Purchase Obligation" has the meaning given that term in the Purchase Agreement.

"Purchaser" means JAE Properties, Inc. and Central Valley Coalition for Affordable Housing, as purchaser under the Purchase Agreement.

"Qualified Tenant" means a tenant (i) with income not exceeding the percentage of area gross median income set forth in Section 42(g)(1)(A) or (B) of the Code (whichever is applicable) who leases an apartment unit in the Project under a lease having an original term of not less than twelve months at a rent not in excess of that specified in Section 42(g)(2) of the Code, and (ii) complying with any other requirements imposed by the Project Documents.

"Recapture Amount" means the "credit recapture amount" as defined in Section 42(j)(2) of the Code.

"Recapture Event" means when there has been a Final Determination that an event has occurred which results in the "recapture" of Federal Housing Tax Credits pursuant to Section 42(j) of the Code and which was not the result of an action on the part of the Investor Limited Partner.

"Regulations" means the rules and regulations of any Agency which are applicable to the Project or the Partnership.

"Regulatory Agreement" means the Regulatory Agreement, if any, entered or to be entered into between the Partnership and the Secretary of Housing and Urban Development and between the Partnership and the California Statewide Communities Development Authority, as issuer of the tax-exempt bonds.

"Regulatory Allocations" means the allocations set forth in Sections 6.5A through 6.5G hereof.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710019

JAE-AMTAX00000310

"Related Agreements" means the Development Agreement, the Purchase Agreement, and each other agreement (other than this Agreement) constituting an exhibit thereto or executed in connection therewith.

"Related Person" has the meaning set forth in Section 1.752-4(b) of the Allocation Regulations.

"Requisite Approvals" means any required approvals of the Lender or any Agency to an action proposed to be taken by the Partnership.

"Rent Restriction Test" means the test pursuant to Section 42 of the Code whereby the gross rent charged to tenants of the low-income units in the Apartment Complex may not exceed thirty percent (30%) of the qualifying income levels.

"Schedule" means the schedule of partners annexed hereto as Schedule A as amended from time to time and as so amended at the time of reference thereto.

"Seller Financing" means the loan provided by Old Lincoln Investors, LLC to the Partnership in an amount not to exceed $600,000, in the form of an Interest-Only Payments Promissory Note, with no less than a 30-year term, an interest rate of up to 6% and payments of interest only as available from Cash Flow, after all operator expenses, reserves, payments due on the Permanent Mortgage Loan and Asset Management Fee. Any unpaid accrued interest and the principal balance outstanding at the time of Sale or Refinancing shall be repaid in accordance with Section 6.2B herein.

"Service" means the Internal Revenue Service.

"Share of Partner Nonrecourse Debt Minimum Gain" means, for each Partner, an amount equal to such Partner's "share of partner nonrecourse debt minimum gain," determined in accordance with the provisions of Section 1.704-2(i)(5) of the Allocation Regulations.

"Share of Partnership Minimum Gain" means, for each Partner, an amount equal to such Partner's "share of partnership minimum gain," determined in accordance with the provisions of Section 1.704-2(g) of the Allocation Regulations.

"Special Investment Company Tax Counsel" means Bronson & Migliaccio, LLP or other counsel acceptable to the Investment Company.

"State" means the State of California.

"Subordinated Loan" means a loan by a General Partner pursuant to Sections, 7.4, 7.8 and 7.9.

"Substitute Limited Partner" means any Person who is admitted to the Partnership as a Limited Partner under the provisions of Section 9.3.

"Surplus Cash" means any unrestricted cash remaining on hand after (1) the payment of (a) all sums due or currently required to be paid under the terms of any Mortgage or Note;

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710020

JAE-AMTAX00000311

(b) all amounts required to be deposited in the reserve fund for replacement; and (c) all obligations of the Partnership other than the Mortgage Loan unless funds for payment are set aside; and (2) the segregation and recording of (a) an amount equal to the aggregate of all special funds to be maintained by the Partnership under the Project Documents or this Agreement, including full funding of all mortgage insurance premium, real estate tax, insurance, and other escrows; (b) all tenant security deposits or prepaid rents held; and (c) all accounts and accrued items payable. Notwithstanding the foregoing, Surplus Cash as of a given date shall also include rental assistance payments properly accrued but not received through such date but received thereafter.

"Tax Credit" means the Federal Housing Tax Credit.

"Tax Credit Reservation" means the receipt by the Partnership of a credit reservation from the Credit Agency or conditional commitment therefor in the annual amount of at least $236,019.

"Tax Matters Partner" means the Partner designated as the Tax Matters Partner of the Partnership by the General Partner pursuant to the provisions of Section 7.13.

"Terminating Capital Transaction" means a Capital Transaction resulting in or involving the termination and winding up of the business of the Partnership or any other event resulting in the "liquidation" of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Allocation Regulations.

"Terminating Event" means the death or permanent disability of, or an adjudication of insanity or incompetence as to, an individual General Partner (unless the Consent of the Investor Limited Partner to a substitute General Partner is received, and such substitute General Partner is admitted to the Partnership by the first to occur of (i) the sixtieth day following such event or (ii) such earlier date as is necessary to prevent a dissolution of the Partnership under the Act), an Event of Bankruptcy as to or dissolution of a General Partner, the transfer of its Partnership Interest by a General Partner, removal of a General Partner, or the voluntary or involuntary withdrawal of a General Partner from the Partnership. For purposes of the foregoing, an individual General Partner shall be deemed to be permanently disabled if he or she becomes disabled during the term of this Agreement through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, is unable to perform substantially all of his or her duties and responsibilities hereunder for 120 days during any period of 365 consecutive calendar days. Involuntary withdrawal shall occur whenever a General Partner may no longer continue as a General Partner by law or pursuant to any terms of this Agreement. In the case of a General Partner, which is an Entity, a transfer of a majority of the voting stock (or other beneficial interest) of the General Partner to a Person who is not an Affiliate of the General Partner shall be deemed to be a transfer by the General Partner of its Partnership Interest.

"Title Policy" means the owner's policy of title insurance issued to the Partnership by Fidelity National Title Insurance Company as endorsed to increase the amount thereof to an amount equal to the appraised value of the Project, but in no event less than the sum of all

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710021

JAE-AMTAX00000312

Permanent Mortgage Loans and Capital Contributions of the Partners, and to update such policy to a date not earlier than 10 days prior to the date of the Investment Closing.

"Uniform Act" means the California Revised Limited Partnership Act as in effect under the laws of the State, as amended from time to time.

"Vessel" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

## ARTICLE II
## CONTINUATION; NAME; PURPOSE AND TERM

Section 2.1    Continuation

The parties hereto hereby agree to continue the limited partnership known as Victoria Heights, Ltd., formed pursuant to the provisions of the Uniform Act.

Section 2.2    Name and Office; Agent for Service

A.    The Partnership shall continue to be conducted under the name and style set forth in Section 2.1. The principal office of the Partnership shall be at 7700 Edgewater Drive, Suite 615, Oakland, CA 94621. The General Partners may at any time change the location of such principal office and shall give due notice of any such change to the Limited Partners.

B.    The name and address of the agent for service of process required to be maintained under the Uniform Act shall be:

> Edmund Johnson
> c/o JAE Properties, Inc.
> 7700 Edgewater Drive
> Oakland, CA 94621

Section 2.3    Purpose

The Partnership has been organized exclusively to provide low income housing to poor and distressed persons by acquiring the Land and the Apartment Complex and developing, financing, constructing, rehabilitating, owning, maintaining, operating and selling or otherwise disposing of the Apartment Complex in accordance and compliance with the Regulatory Agreement and consistent with the charitable purposes of the Managing General Partner. To the extent not inconsistent with such purpose, the Partnership shall operate in a business like manner and in a manner to operate the Apartment Complex so as to generate a positive cash flow from operations. The Partnership shall not engage in any other business or activity.

Section 2.4    Authorized Acts

New D\Victoria Heights\LP.6                18

In furtherance of its purposes, but subject to all other provisions of this Agreement including, but not limited to, Article VII, the Partnership is hereby authorized:

(i)     To acquire by purchase, lease or otherwise any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership.

(ii)    To acquire, construct, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Partnership.

(iii)   To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Partnership and to secure the same by mortgage, pledge or other lien on the Property or any other assets of the Partnership, to the extent permitted by the Commitments.

(iv)    To prepay in whole or in part, refinance, recast, increase, modify or extend any Mortgage and in connection therewith to execute any extensions, renewals, or modifications of such Mortgage.

(v)     To employ any Person, including any Affiliate, to perform services for, or to sell goods to, the Partnership (including without limitation management services) and to pay for such goods and services; provided that (except with respect to any contract specifically authorized by this Agreement) the terms of any such transaction with an Affiliate shall not be less favorable to the Partnership than would be arrived at by unaffiliated parties dealing at arms' length.

(vi)    To execute any and all notes, mortgages and security agreements in order to secure loans from the Lender and any and all other documents, including but not limited to the Project Documents, required by the Lender or any Agency in connection with each Mortgage and Mortgage Loan and the acquisition, construction, rehabilitation, repair, development, improvement, maintenance and operation of the Property, or otherwise required by the Lender or any Agency in connection with the Property.

(vii)   To execute contracts with any Agency.

(viii)  To execute leases of some or all of the apartment units of the Project.

(ix)    To modify or amend the terms of any agreement or contract which the General Partners are authorized to enter into on behalf of the Partnership; provided, however, that such terms as amended shall not (a) materially adversely affect the Partnership or the Limited Partners or (b) be in contravention of any of the terms or conditions of this Agreement.

(x)     To enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710023

JAE-AMTAX00000314

of the purposes of the Partnership, so long as said activities and contracts may be lawfully carried on or performed by a partnership under the laws of the State.

(xi)     To execute the Related Agreements and any notices, documents or instruments permitted or required to be executed or delivered in connection therewith or pursuant thereto.

Section 2.5     Term and Dissolution

A.     The Partnership shall continue in full force and effect until December 31, 2052, except that the Partnership shall be dissolved prior to such date upon the happening of any of the following events:

(i)     The sale or other disposition of all or substantially all the assets of the Partnership;

(ii)     A Terminating Event with respect to a General Partner unless the business of the Partnership is continued pursuant to Article VIII;

(iii)     The election to dissolve the Partnership made in writing by the General Partners with the Consent of the Investor Limited Partner and any Requisite Approvals or by the Investor Limited Partner pursuant to Section 4.5; or

(iv)     The entry of a final decree of dissolution of the Partnership by a court of competent jurisdiction.

B.     Upon dissolution of the Partnership (unless the business of the Partnership is continued pursuant to Article VIII), the General Partners (or for purposes of this paragraph their trustee, receiver, successor or legal representative) shall cause the cancellation of the Certificate and liquidate the Partnership assets and apply and distribute the proceeds thereof in accordance with Section 6.3. Notwithstanding the foregoing, in the event such liquidating General Partners shall determine that an immediate sale of part or all of the Partnership's assets would cause undue loss to the Partners, the liquidating General Partners may, in order to avoid such loss, defer liquidation of, and withhold from distribution for a reasonable time, any assets of the Partnership except those necessary to satisfy the Partnership debts and obligations (other than Subordinated Loans).

## ARTICLE III
## FINANCING AND DISPOSITION OF PROPERTY

A.     The Partnership is authorized to obtain the Permanent Mortgage Loan to finance the acquisition, development and construction of the Property and (to the extent permitted by the Lender) to meet the initial expenses of operating the Project and to secure the same by the Mortgage. Each Permanent Mortgage shall provide that no Partner or Related Person shall bear the economic risk of loss for all or any part of such Permanent Mortgage Loan.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710024

JAE-AMTAX00000315

The General Partners are specifically authorized, for and on behalf of the Partnership, to execute the Project Documents and any permitted amendments thereto and, subject to the limitations set forth herein, such other documents as they deem necessary or appropriate in connection with the acquisition, development, operation and financing of the Property.

B.     Each General Partner shall be bound by the terms of the Project Documents. Any incoming General Partner shall as a condition of receiving any interest in the Property agree to be bound by the Project Documents to the same extent and on the same terms as the other General Partners. Upon any dissolution of the Partnership or any transfer of the Property while any Mortgage is held by any Lender, no title or right to the possession and control of the Property and no right to collect the rents therefrom shall pass to any Person who is not, or does not become, bound in a manner satisfactory to the Lender and the Agency to the Project Documents and the provisions of this Agreement. The Project Documents shall be binding upon and shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns as long as the corresponding Mortgage Loan shall be outstanding.

C.     The Partnership may increase the amount of the Mortgage Loan or refinance any Mortgage, including any required transfer or conveyance of Partnership assets for security or mortgage purposes, and may sell, lease, exchange or otherwise transfer or convey all or substantially all the assets of the Partnership; provided, however, that the terms of any such increase, refinancing, sale, exchange or other transfer or conveyance effected after the Admission Date must receive the Consent of the Investor Limited Partner before such transaction shall be binding on the Partnership. Notwithstanding the foregoing, no such Consent shall be required for the leasing of apartments to tenants in the normal course of operations; provided, however, unless such Consent is obtained the Partnership shall lease the Project in such a manner as to qualify as a "qualified low-income housing project" under Section 42(g)(1) of the Code, and shall lease all of the Low Income Units in the Project to Qualified Tenants.

Upon the sale of the Property by the Partnership, no Person may pay to any Person real estate commissions in excess of the lesser of (i) that which is reasonable, customary, and competitive with those paid in similar transactions in the same geographic area or (ii) 6% of the sales price of the Property.

### ARTICLE IV
### PARTNERS; CAPITAL

Section 4.1     General Partners

The General Partners of the Partnership are Central Valley Coalition for Affordable Housing and JAE Properties, Inc.  Their addresses and Capital Contributions are set forth in Schedule A.

Section 4.2     Limited Partners

A.     AMTAX is hereby admitted as the Investor Limited Partner. Its address and Capital Contribution are set forth in the Schedule.  The payment of its Capital Contribution is governed by Section 5.1.

New D\Victoria Heights\LP.6                    21

B.     Protech is hereby admitted as the Special Limited Partner.  Its address and Capital Contribution are set forth in the Schedule.

C.     The Original Limited Partners is Manford Forkner.  By his execution of this Agreement, the Original Limited Partner hereby withdraws as Limited Partner and acknowledges and agrees that the Original Limited Partner, as such, shall have no further rights or obligations with respect to the Partnership as of the Admission Date.

Section 4.3     Partnership Capital and Capital Accounts

A.     The capital of the Partnership shall be the aggregate amount of the cash and the Gross Asset Value of property contributed by the General Partners and by the Limited Partners as set forth in Schedule A. Notwithstanding anything else contained herein, the Managing General Partner shall have no obligation to make additional Capital Contributions for any reason. Except as specifically set forth herein, no Partner shall have any right to make voluntary Capital Contributions to the Partnership. No interest shall be paid by the Partnership on any Capital Contribution to the Partnership. Schedule A shall be amended from time to time to reflect the withdrawal or admission of Partners, any changes in the Partnership Interests held by a Partner arising from the transfer of a Partnership Interest to or by such Partner and any change in the amounts to be contributed or agreed to be contributed by any Partner.

B.     An individual Capital Account shall be established and maintained for each Partner, including any additional or substituted Partner who shall hereafter receive an interest in the Partnership. The Capital Account of each Partner shall be maintained in accordance with the following provisions:

(i)     To each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits, and any items in the nature of income or gain that are specially allocated pursuant to Section 6.5 hereof, and the amount of any Partnership liabilities that are assumed by such Partner or that are secured by any Partnership Property distributed to such Partner;

(ii)     To each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Partnership Property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated pursuant to Section 6.5 hereof, and the amount of any liabilities of such Partner that are assumed by the Partnership or that are secured by any property contributed by such Partner to the Partnership.

In the event that the Gross Asset Values of Partnership assets are adjusted pursuant to this Agreement, the Capital Accounts of all Partners shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Partnership recognized gain or loss equal to the amount of such aggregate net adjustment.

C.     The original Capital Account established for any substituted Partner shall be in the same amount as, and shall replace, the adjusted Capital Account of the Partner which such substituted Partner succeeds, and, for the purposes of the Agreement, such substituted Partner shall be deemed to have made the Capital Contribution, to the extent actually paid in, of

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710026

JAE-AMTAX00000317

the Partner which such substituted Partner succeeds. The term "substituted Partner," as used in this paragraph, shall mean a Person who shall become entitled to receive a share of the Profits or Losses, Tax Credits and distributions of the Partnership by reason of such Person succeeding to the Partnership Interest of a Partner by assignment of all or any part of a Partnership Interest. To the extent a substituted Partner receives less than 100% of the Partnership Interest of a Partner, its Capital Account and Capital Contribution shall be in proportion to the Partnership Interest it receives, and the Capital Account and Capital Contribution of the Partner who retains a partial interest in the Partnership shall continue, and not be replaced, in proportion to the Partnership Interest it retains.

D.     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of the Capital Accounts are intended to comply with the Allocation Regulations and shall be interpreted and applied in a manner consistent with such Allocation Regulations. In the event the General Partners shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with the Allocation Regulations, the General Partners may make such modification, subject to the provisions of Section 6.3D. The General Partners shall adjust the amounts debited or credited to Capital Accounts with respect to (i) any property contributed to the Partnership or distributed to the Partners, and (ii) any liabilities that are secured by such contributed or distributed property that are assumed by the Partnership or the Partners, in the event the General Partners shall determine such adjustments are necessary or appropriate pursuant to Section 1.704-1(b)(2)(iv) of the Allocation Regulations. Subject to the provisions of Section 6.3D, the General Partners also shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with the Allocation Regulations.

E.     The Partnership shall not redeem or repurchase any Partnership Interest, and no Partner shall have the right to withdraw, or receive any return of, its Capital Contribution, except as specifically provided herein. The General Partners shall have no personal liability for the repayment of the Capital Contribution of any Limited Partner. Nothing in this Section 4.3 shall alter the limitation on liability of a General Partner or its Affiliates pursuant to Section 7.7.

Section 4.4     Liability of Limited Partners

No Limited Partner shall be liable for any debts, liabilities, contracts, or obligations of the Partnership. A Limited Partner shall be liable only to make payments of its Capital Contribution as and when due hereunder. After its Capital Contribution shall be fully paid, no Limited Partner shall, except as otherwise required by the Uniform Act, be required to make any further capital contributions or payments or lend any funds to the Partnership.

Section 4.5     Certain Rights of Investor Limited Partner

A.     Subject to the provisions hereinafter set forth in this Section 4.5, and to the Regulations, in addition to the other rights provided for in this Agreement, the Investor Limited Partner shall have the right:

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710027

JAE-AMTAX00000318

      (i)    To amend this Agreement, subject to the provisions of Section 13.9; provided that such amendment (a) shall not in any manner allow the Limited Partners to take any action which would constitute their taking part in the control of the Partnership's business within the meaning of the Uniform Act, and (b) shall not in any manner, without the consent of any General Partner affected, except in the case of a removal pursuant to Section 4.5A(iv), alter the rights, powers, obligations or duties of the affected General Partner or its interest in the Profits and Losses of the Partnership, Tax Credits or distributions or alter any of the provisions of Section 4.5B;

      (ii)    To dissolve the Partnership upon the consent of the Managing General Partner and Co-General Partner;

      (iii)    To approve or disapprove, with the consent of the Managing General Partner and the Co-General Partner, the sale of all or substantially all of the assets of the Partnership; and

      (iv)    To remove any or all of the General Partners and elect one or more new General Partners upon the occurrence of any of the following:

      (1)    In the event of misconduct, or failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner;

      (2)    The General Partner shall have violated any material provisions of the Investment Agreement, or the Mortgage Loan Agreement, or the Extended Use Agreement, or any material provisions of any other Project Document or Bond Documents, or other document required in connection with the Mortgage Loan, or any provisions of the Lender and/or Agency regulations applicable to the Apartment Complex, or an event sufficient for a Purchase Obligation to arise under the Purchase Agreement shall have occurred (other than Lender or Agency disapproval); or

      (3)    The General Partners, or any of them, shall have violated any rights, powers, duties, representations or warranties as set forth in Article VII herein or shall have violated any material provision of this Agreement, defaulted on a guarantee herein or the timely payment of a Penalty Payment or violated any material provision of applicable law; or

      (4)    The General Partners, or any of them, shall have caused the Construction Loan or the Permanent Mortgage Loan to go into default and become subject to foreclosure; or

      (5)    The General Partners, or any of them, shall have conducted their own affairs or the affairs of the Partnership in such manner as would cause the termination of the Partnership for federal income tax purposes; or cause the Partnership to be treated for federal income tax purposes as an association, taxable as a corporation or shall have effected a Change of Control without the consent of the Investment Company;

      (6)    After Permanent Mortgage Commencement failure to maintain a debt coverage ratio (as calculated in the definition of Debt Coverage Date) of at least

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710028

JAE-AMTAX00000319

1.05 for any consecutive six (6) month period (exclusive of deferred Development Fees, Asset Management Fee, and Incentive Supervisory Fee); or

        (7)     Failure to furnish reports as required in Section 12.1; or

        (8)     Any penalty assessed against the Partnership or the Co-General Partner for the benefit of the Limited Partner, or any amount otherwise due the Limited Partner from the Co-General Partner or the Partnership, is not paid within thirty (30) days after notice, or any operating deficits to the extent required under Section 7.9 are not funded and paid by the Managing General Partner; or

        (9)     After the first nine (9) months of operations, the occupancy of the Project for any three (3) consecutive months, and/or the average occupancy for any year, falls below 85% unless such reduced occupancy is solely due to fire damage or similar casualty (repaired within a reasonable time) or other such catastrophes beyond the control of the General Partners;

        (10)    The qualified Low Income Units of the Project fall below ninety percent (90%) of the total 150 Low Income Units;

        B.     The Interest of any General Partner removed pursuant to this Section 4.5 shall be valued and sold pursuant to Section 8.4.

        C.     Upon written request to the Managing General Partner and to the Co-General Partner by the Investor Limited Partner, the Managing General Partner shall call a meeting of the Partners for any matters for which the Partners may vote, as set forth herein. Upon receipt of a written request either in person or by certified mail stating the purpose(s) of the meeting, the Managing General Partner shall provide all Partners within ten days after receipt of said request, written notice (either in person or by certified mail) of a meeting and the purpose of such meeting to be held on a date not less than 15 nor more than 60 days after receipt of said request, at a time and place convenient to the Partners.

        D.     In the event a General Partner is removed pursuant to this Section 4.5, substantial cost and expense will be incurred by the Partnership in effecting the removal, arranging for a suitable replacement and completing the orderly transfer of records and management. It is understood and agreed by, between and among the parties that in view of the reasons for removal as set forth in subparagraph (A)(iv) therein, the removed General Partner, and not the Partnership nor the Investor Limited Partner, should be charged with these costs and expenses. The parties agree that liquidated damages for these costs and expenses (only and not in lieu of other amounts owed by such General Partner nor other losses incurred due to such General Partner) in the amount of $25,000 shall be paid by such removed General Partner to the Partnership upon such removal and that the Partnership shall be entitled to immediately collect, offset or otherwise initiate any actions authorized under the law to recover such liquidated damages from such removed General Partner or its assets and receivables.

## ARTICLE V
## CAPITAL CONTRIBUTIONS OF INVESTOR LIMITED PARTNER

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710029

JAE-AMTAX00000320

Section 5.1     Installments of Capital Contributions

A.     The Investor Limited Partner shall contribute as its Capital Contribution the sum of $1,886,264 payable in the following installments:

(1) $1,131,759 upon the latest to occur of (i) Tax Credit Reservation, and receipt of Code section 42(M)(2)(D) determination letter, or equivalent, (ii) the closing of Bonds with the proceeds of this installment to be placed into an escrow account held by the trustee or by a title company approved by the Investment Company and disbursed pursuant to a closing statement approved by the Investment Company. Also, submitted with draw requests shall be invoices, lien waivers and certification by an inspecting architect approved by the Investment Company, or (iii) receipt of a commitment acceptable to the Investment Company for the Permanent Mortgage Loan, or (iv) the Admission Date (the "First Installment").

(2) $471,566 on the latest to occur of (i) Completion Date, or, (ii) Cost Certification, (iii) satisfaction of all of the conditions to the payment of the First Installment (the "Second Installment"), this installment shall be placed in Escrow and disbursed according to the procedure described above in Section 5.1A(1);

(3) $141,470 upon the latest to occur (i) the Initial 90% Occupancy Date, (ii) the achievement of Breakeven, (iii) Final Closing, (iv) receipt of Forms 8609 for all Buildings, (v) attestation by the Partnership Accountant providing a detailed analysis of the depreciable asset including personal property, land improvements, and building, or (vi) satisfaction of all the conditions to the payment of the First and Second Installments (the "Third Installment"); and

(4) $141,470 upon the latest to occur of (i) for six (6) consecutive months after Final Closing an average of 1.15 debt coverage, exclusive of payment of deferred Developer fees, achieving the "Debt Coverage Date", (ii) the Initial 95% Occupancy Date and 100% of the Low Income Units are Tax Credit qualified, (iii) satisfaction of all of the conditions to the payment of the First through Third Installments (the "Fourth Installment").

B.     The obligation of the Investor Limited Partner to make each Installment (except as otherwise provided) is subject to each of the following conditions:

(i)     The Managing General Partner shall have executed and delivered to the Investor Limited Partner a certificate (the "Payment Certificate"), in the form attached hereto as Exhibit 1, dated the date such Installment is to be paid to the Partnership and attaching the Title Policy endorsement referred to therein.

(ii)     In the case of the First Installment, all Requisite Approvals to the admission of AMTAX as Investor Limited Partner pursuant to this Agreement shall have been obtained.

(iii)     Each of the representations and warranties set forth in Section 7.5 shall in all material respects be true and correct.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710030

JAE-AMTAX00000321

(iv)    No event shall have occurred which would permit AMTAX to give an Election Notice under the Purchase Agreement.

(v)    No event shall have occurred which suspends or terminates the obligations of the Investor Limited Partner to pay Installments under the provisions of this Agreement which has not been cured as therein provided.

C.  Notwithstanding the foregoing, if an Installment has not become due because of a failure to satisfy any condition to the payment thereof, but such condition can be satisfied by the payment of money, then in the discretion of the Investor Limited Partner such Installment may be collected notwithstanding the failure to satisfy such condition, provided that when such Installment is paid (1) the amount required to satisfy such condition is disbursed directly to the requisite parties for the purpose of satisfying such condition, and (2) any acceleration of maturity of indebtedness and any other default and any action or proceeding which was the basis of the failure to satisfy such condition or which resulted from such failure has been effectively waived and, in the case of any such action or proceeding, terminated with prejudice.

D.  At the time of the First Installment of Capital Contribution of the Investor Limited Partner, the Investor Limited Partner or an affiliate, shall provide a loan (the "Bridge Loan") to the Partnership in an amount equal to $471,566, which may be converted to equity upon the conditions being met for release of the Second Installment as set forth herein.  The Bridge Loan will mature on the earlier of (i) nine (9) months from the date of the First Installment of Capital Contribution, or (ii) the date on which the Second Installment of Capital Contribution is earned.

Section 5.2    Adjustments to Capital Contributions

The Capital Contribution of the Investor Limited Partner shall be subject to reduction in the manner provided in this Section 5.2.

A.    If, as of the Completion Date and based upon the Cost Certification, it is determined that the amount of Tax Credits for which the Project will be eligible (as evidenced by applicable documentation including Forms 8609) is less than the Maximum Annual Credit, such difference being hereinafter referred to as a "Credit Shortfall," then there shall be a reduction in the Investor Limited Partner's Capital Contribution in an amount equal to the product of (i) the Credit Shortfall and (ii) 8.00 (referred to as the "Credit Shortfall Adjustment").  Such reduction shall be applied by decreasing the amount of the next Installment due, and, if necessary, further Installments (reducing the earliest ones first) by the amount of the Credit Shortfall Adjustment.  If all Installments of Capital Contribution have been paid at the time of a Credit Shortfall, or the aggregate amount of Installments remaining at the time of the Credit Shortfall is less than the amount of the Credit Shortfall Adjustment, then the Credit Shortfall Adjustment, or any balance of the Credit Shortfall Adjustment over the amount of the remaining Installments, as the case may be, shall be immediately distributed, in cash, to the Investor Limited Partner.

B.    In the event there is a Credit Deficiency or any Recapture Event then the Investor Limited Partner shall be entitled to a penalty payment from the Co-General Partner and

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710031

JAE-AMTAX00000322

the Managing General Partner, or solely from the Managing General Partner if the Co-General Partner has withdrawn (the "Penalty Payment"). The Penalty Payment will be in a total amount equal to the sum of: (i) the product of (a) the total of the Credit Deficiency for each of the years of Projected Credit and (b) .919 and (ii) any interest and/or penalty that may be assessed by the Service for any year as a result of the Recapture Event. The Penalty Payment shall be paid by the Co-General Partner within thirty (30) days of written notice from the Investor Limited Partner. The Co-General Partner shall pledge its Partnership Interest to secure such payment. In the event the Co-General Partner fails to make any Penalty Payment when due, the Investor Limited Partner may, at its sole discretion, pursue one or more remedies including any of the following remedies: (i) attach or otherwise seize any amounts otherwise distributable to the Co-General Partner from Cash Flow of the Partnership; (ii) recover the funds from the Co-General Partner; (iii) assert its rights under the Uniform Commercial Code or other applicable law either against the Co-General Partner's Partnership Interest or other assets of the Co-General Partner; and (iv) remove the Co-General Partner pursuant to Section 4.5.

      C.    Attached as Schedule B is a Schedule of Specified Tax Benefits that were calculated based upon projections provided by the General Partners and which constitute a substantial portion of the Investment Company's expected return. If, prior to funding the First Installment of Capital Contribution and once again prior to funding the Third Installment, the Investment Company determines that the Specified Tax Benefits are not achievable due to inaccuracies contained within or modifications to the underlying assumptions contained within the projections provided by the General Partners, the parties agree to amend the Investment Company's Capital Contribution to provide the Investment Company with a return that is consistent with the return contemplated by the Specified Tax Benefits.

      D. After Admission of the Investor Limited Partner, the General Partners shall be entitled to a return of capital in an amount equal to their respective capital contributions made prior to Admission, subject to the General Partners maintaining an aggregate Capital Contribution of no more than .1% of the Capital Contributions of all Partners. This return of capital will be funded from the proceeds of Investor Limited Partner's Capital Contribution.

      E. In the event the amount of Tax Credits available to and accepted by the Investor Limited Partner is more than the Maximum Annual Credit as stated herein, the Partnership shall be entitled to an additional Capital Contribution at the time of the funding of the Third Installment in an amount that would generate the same internal rate of return that was forecast with the original projected delivery of Tax Credits and the projection of losses as set forth in Schedule B herein. An affiliate of the Investor Limited Partner may be admitted as a Limited Partner and will make such Capital Contributions in the event that the Investor Limited Partner is unable to make the necessary payment.

## ARTICLE VI
## DISTRIBUTIONS OF CASH; ALLOCATIONS OF PROFITS, LOSSES AND TAX CREDITS

Section 6.1    Profits and Losses and Tax Credits

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710032

JAE-AMTAX00000323

A.     After giving effect to the special allocation provisions of Section 6.4, Profits or Losses and Tax Credits for any Partnership Fiscal Year shall be allocated .0495% to the Managing General Partner, .0495% to the Co-General Partner, .001% to Protech and 99.9% to the Investor Limited Partner.

B.     After giving effect to the special allocation provisions of Section 6.4, Profits or Losses from a Capital Transaction in any Partnership Fiscal Year shall be allocated to and among the Partners as follows:

As to Profits:

First, an amount of Profits equal to the aggregate negative balances (if any) in the Capital Accounts of all Partners having negative balance Capital Accounts shall be allocated to such Partners in proportion to their negative Capital Account balances until all such Capital Accounts have zero balances; and

Second, an amount of Profits shall be allocated to each of the Partners until the positive balance in the Capital Account of each Partner equals the amount of cash which would be distributed to such Partner in accordance with the provisions of Clause Ninth of Section 6.2B(ii).

As to Losses:

First, an amount of Losses equal to the aggregate positive balances (if any) in the Capital Accounts of all Partners having positive balance Capital Accounts shall be allocated to such Partners in proportion to their positive Capital Account balances until all such Capital Accounts have zero balances; provided, however, that if the amount of Losses so to be allocated is less than the sum of the positive balances in the Capital Accounts of those Partners having positive balances in their Capital Accounts, then such Losses shall be allocated to the Partners in such proportions and in such amounts so that the Capital Account balances of each Partner shall equal, as nearly as possible, the amount of cash such Partner would in accordance with the provisions of Clause Ninth of Section 6.2B(ii); and

Second, the balance, if any, of such Losses shall be allocated .0045% to the Managing General Partner and .0045% to Co-General Partner, .001% to Protech and 99.9% to the Investor Limited Partner.

Section 6.2     Application and Distributions Prior to Dissolution

A.     Application and Distribution of Cash Flow

(i)     Except as otherwise provided below, the General Partners shall determine, as of the end of each calendar quarter, the amount of Cash Flow that is available as of the end of such period to be applied as provided in Section 6.2A(ii). Cash Flow that is so determined as available for distribution as of the end of any period shall be deemed Cash Flow for such period even if distributed after such period.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710033

JAE-AMTAX00000324

(ii)     Subject to the provisions of Section 5.2 with respect to any Credit Deficiency or Recapture Amount or other amounts due the Investor Limited Partner including Penalty Payments, the amount of Cash Flow shall be distributed as follows:

First, to the maintenance of Operating Reserves as set forth in Section 7.8B herein;

Second, to the payment to the Manager of the Investment Company of any current and accrued Asset Management Fee and any penalties or any interest;

Third, to the payment of any current and accrued Compliance Monitoring Fee to the Managing General Partner as set forth in Section 7.10 herein.

Fourth, to the payment of any deferred portion of the Developer Fee in an annual amount that still enables the property to operate at a 1.00 debt coverage ratio, exclusive of payment of any Asset Management Fees and Partnership Management Fees; All payments to be first applied to principal and then interest as available;

Fifth, to the payment of any interest due and payable on the Seller Financing;

Sixth, to the repayment of any Subordinated Loans of the General Partners;

Seventh, to the payment of the Partnership Management Fee;

Eighth, a priority distribution to the Investor Limited Partner of 20% of the balance;

Ninth, to the repayment of the Incentive Supervisory Fee to the Co-General Partner in the amounts set forth in Section 7.10 D herein; and

Tenth, the balance, 99.9% to the Investment Company and .0495% to the Managing General Partner and .0495% to the Co-General Partner, and .001% to Protech.

(iii)     Cash flow shall be applied as provided in Section 6.2A(ii) within thirty (30) days after the end of each calendar quarter. Notwithstanding that applications are made quarterly. The amount of each item on an annual basis must be paid prior to payment of any subsequent items.

B.     Distributions of Capital Proceeds from a Capital Transaction

(i)     The General Partners shall determine, within 45 days after the Partnership's receipt thereof, the amount of Capital Proceeds available to be applied as provided in Section 6.2B(ii).

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710034

JAE-AMTAX00000325

(ii)     Subject to the provisions of Section 5.2 with respect to any Credit Deficiency or Recapture Amount or other amounts due the Investor Limited Partner, including Penalty Payments, and further subject to the provisions of Section 6.3 below, any Capital Proceeds shall be distributed to and among the Partners in the following amounts and order of priority:

First, to the payment of all debts and liabilities of the Partnership excluding those owed to Partner and the Seller Financing, and to the establishment of any required reserves;

Second, to the payment of the Asset Management Fee of such year and for previous year as to which the Asset Management fee has not been paid in full;

Third, in the event of a sale, to the Investment Company a priority distribution (the "Exit Tax Distribution") equal to the after-tax value of which is sufficient to "zero out" the Investment Company's negative capital account and pay any taxes thereon;

Fourth, to the payment of any outstanding deferred portions of the Developer Fee;

Fifth, to the payment of the principal and any interest on the Seller Financing;

Sixth, to the repayment of any Subordinated Loans of the Co-General Partner;

Seventh, except in the case of a refinancing, to each Partner in an amount equal to the then positive balance in its capital account;

Eighth, a priority distribution to the Investor Limited Partner of 20% of the balance;

Ninth, to the payment of an Incentive Supervisory Fee to the Managing General Partner as set forth in Section 7.10 D herein;

Tenth, the balance, 99.9% to the Investment Company, .001% to Protech and .0495% to the Managing General Partner and .0495% to the Co-General Partner.

Section 6.3     Liquidation

A.     Upon the liquidation and dissolution of the Partnership, unless the business of the Partnership is continued pursuant to the provisions of Sections 8.2 or 8.3 hereof, the General Partners shall liquidate the assets of the Partnership and cause the business of the Partnership to be wound up in accordance with the Uniform Act and cause the Certificate to be cancelled in accordance with the provisions of Section 2.5B.

B.      Subject to the provisions of Section 6.3C below, any Capital Proceeds from a Terminating Capital Transaction remaining after payment of, or adequate provision for, the debts and obligations of the Partnership shall be distributed to those Partners with positive Capital Account balances (after taking into account all Capital Account adjustments including under Section 6.1.B, for the Partnership taxable year) in proportion to said Capital Account balances.

C.      Except to the extent of his or its Share of Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain, if any, no Partner shall have a Deficit Restoration Obligation nor shall any Partner otherwise be required to restore any deficit balance in his or its Capital Account at any time.

D.      The parties intend that, as a result of the application of the allocation and 0distribution provisions contained in this Article VI, any Capital Proceeds from a Terminating Capital Transaction under Section 6.3B will be distributed in the same manner as Capital Proceeds are distributed under the provisions of Section 6.2B. If the Partnership is advised at any time by the Accountants or counsel that an actual distribution of Capital Proceeds at the end of any Fiscal Year in accordance with the provisions of Section 6.3B would not result in each Partner receiving the amount that it would have received if Section 6.2B rather than Section 6.3B applied to such distribution, the General Partner shall so notify the Limited Partners and, with the Consent of the Investor Limited Partner, are authorized and empowered to amend the provisions of this Article VI relating to the allocation of Profits or Losses (other than the Regulatory Allocations) for such Fiscal Year (and for subsequent Fiscal Years if necessary) to cure such defect consistent with the principles set forth in the first sentence of this Section 6.3(d).

Section 6.4    Special Allocation Provisions

Notwithstanding anything to the contrary contained herein:

A.      Nonrecourse Deductions shall be allocated 99.9% to the Investor Limited Partner, .001% to the Special Limited Partner, .0495% to the Managing General Partner and .0495% to the Co-General Partner.

B.      Partner Nonrecourse Deductions shall be allocated to and among the Partners in the manner provided in the Allocation Regulations.

C.      Subject to the provisions of Section 6.4P, if there is a net decrease in Partnership Minimum Gain for a Partnership Fiscal Year, the Partners shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-2(f) of the Allocation Regulations.

D.      Subject to the provisions of Section 6.4P, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain for a Partnership Fiscal Year, then any Partner with a Share of such Partner Nonrecourse Debt Minimum Gain shall be allocated items of Partnership income and gain in accordance with the provisions of Section 1.704-2(i)(4) of the Allocation Regulations.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710036

JAE-AMTAX00000327

E.     Subject to the provisions of Sections 6.4A through 6.4D above, in the event that any Limited Partner (who is not also a General Partner) unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Allocation Regulations, items of Partnership income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Allocation Regulations, the Adjusted Capital Account Deficit of such Limited Partner as quickly as possible. This Section 6.4E is intended to constitute a "qualified income offset" provision within the meaning of the Allocation Regulations and shall be interpreted consistently therewith.

F.     Subject to the provisions of Sections 6.4A through 6.4E above, in no event shall any Limited Partner be allocated Losses that would cause it to have an Adjusted Capital Account Deficit as of the end of any Partnership Fiscal Year. Any Losses that are not allocated to a Limited Partner by reason of the application of the provisions of this Section 6.4F shall be allocated to the Co-General Partner.

G.     Subject to the provisions of Sections 6.4A through 6.4F above, in the event that any Limited Partner (who is not also a General Partner) has an Adjusted Capital Account Deficit at the end of any Partnership Fiscal Year, items of Partnership income and gain shall be specially allocated to each such Limited Partner in the amount of such Adjusted Capital Account Deficit as quickly as possible.

H.     Without limiting the generality of Section 6.4B above, (i) if the Partnership incurs recourse obligations to fund the payment of deductible items which are not anticipated to be paid in the ordinary course of business or (ii) if the Partnership incurs losses from extraordinary events which are not recovered from insurance or otherwise and which are not anticipated to be paid in the ordinary course of business (the obligations and losses under clauses (i) and (ii) being referred to herein collectively as "Excess Expenses") in respect of any Fiscal Year, then the calculation and allocation of Losses shall be adjusted as follows: first, an amount of deductions equal to such Excess Expenses for the Fiscal Year in question shall be allocated to the Co-General Partner; and second, the balance of such deductions and all gross income shall be allocated as provided in Section 6.1A. For purposes of this Section 6.4H, extraordinary events include casualty losses, losses resulting from liability to third parties for tortious injury, losses resulting from a breach of a legal duty by the Partnership or by the General Partners, and deductions resulting from other liabilities which are not incurred in the ordinary course of business. Nothing in this Section 6.4H shall prevent the Partnership from recovering an extraordinary loss from a General Partner who is liable therefor by law or under this Agreement. If any Excess Expenses shall be repaid from Cash Flow generated in respect of any Fiscal Year, then the allocation of Profits and Losses under Section 6.1A for such Fiscal Year shall be adjusted as follows: first, the General Partner shall be allocated an amount of the gross income of the Partnership equal to the amount of the Excess Expenses repaid in such Fiscal Year; and second, the balance of such gross income and all deductions shall be allocated as provided in Section 6.1(a).

I.     In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to

New D\Victoria Heights\LP.6                    33

take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value. In the event that the Gross Asset Value of any Partnership Property is adjusted pursuant to the terms of this Agreement, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder. Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 6.4I are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

J.     Syndication expenses, if any, for any Fiscal Year or other period shall be specially allocated to the Investor Limited Partner.

K.     For purposes of determining the Profits, Losses, Tax Credits or any other items allocable to any period, Profits, Losses, Tax Credits and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partners using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

L.     To the extent that interest on loans (or other advances which are deemed to be loans) made by any General Partner to the Partnership is determined to be deductible by the Partnership in excess of the amount of interest actually paid by the Partnership, such additional interest deduction(s) shall be allocated solely to such General Partner.

M.     If the Service successfully disallows the deduction of all or any part of any fee paid by the Partnership to either General Partner or its Affiliates by recharacterizing such fee as a distribution to such General Partner, there shall be, to the extent permitted by the Code, a special allocation of gross income to such Co-General Partner (but not under any circumstances to the Managing General Partner) for the Fiscal Year with respect to which such disallowed deduction was claimed by the Partnership in the amount of such disallowed deduction.

N.     For purposes of determining each Partner's proportionate share of the excess Nonrecourse Liabilities of the Partnership pursuant to Section 1.752-3(a)(3) of the Allocation Regulations, the Investor Limited Partner shall be deemed to have a 99.9% interest in Profits, the Special Limited Partner shall be deemed to have a .001% interest in Profits, the Managing General Partner shall be deemed to have a .0495% interest in Profits, and the Co-General Partner shall be deemed to have a .0495% interest in Profits.

O.     In accordance with Treasury Regulation Section 1.704-1(b)(4)(ii), all expenditures giving rise to the allowance of any Tax Credits, including credits under Section 42, shall be allocated .0495% to the Managing General Partner, .0495% to the Co-General Partner, .001% to the Special Limited Partner, and 99.9% to the Investor Limited Partner for the relevant taxable year, It being the intention that Federal Housing Tax Credits be allocated .0495% to the

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710038

JAE-AMTAX00000329

Managing General Partner, .0495% to the Co-General Partner, .001% to the Special Limited Partner, and 99.9% to the Investor Limited Partner.

P.     Any recapture of any Tax Credits shall be allocated among the Limited Partners, as a class, and the General Partners, as a class, in the same manner in which such classes shared the Tax Credits

Q. If for any Fiscal Year the application of the minimum gain chargeback provisions of Section 6.4C or Section 6.4D would cause a distortion in the economic arrangement among the Partners and it is not expected that the Partnership will have sufficient other income to correct that distortion, the General Partners may request a waiver from the Commissioner of the Service of the application in whole or in part of Section 6.4C or Section 6.4D in accordance with Section 1.704-2(f)(4) of the Allocation Regulations. Furthermore, if additional exceptions to the minimum gain chargeback requirements of the Allocation Regulations have been provided through revenue rulings or other Service pronouncements, the General Partners are authorized to cause the Partnership to take advantage of such exceptions if to do so would be in the best interest of a majority in interest of the Partners.

R. In the event that the loss or deduction associated with a fee payable to any Partner under Section 7.10 is disallowed, there shall be specially allocated to such Partner an amount of gross income equal to the amount of the disallowed loss or deduction provided however that any such special allocation that would otherwise be made to the Managing General Partner shall instead be made to the Co-General Partner.

S. In no event shall the Managing General Partner receive an allocation of Profits and Losses other than .0495%.

Section 6.5     Order of Application

The provisions of this Article VI shall be applied in the order required by the applicable provisions of the Allocation Regulations or if no such order is specified, in the manner determined by the Accountants.

## ARTICLE VII
## RIGHTS, POWERS AND DUTIES OF THE GENERAL PARTNERS

Section 7.1     Restrictions on Authority

A.     Notwithstanding any other provisions of this Agreement, the General Partners shall have no authority to perform any act in respect of the Partnership or the Project in violation of (i) any applicable law or regulation, or (ii) any agreement between the Partnership and any Lender or Agency.

B.     The General Partners shall not have any authority to do any of the following acts, without the Consent of the Investor Limited Partner and any Requisite Approvals:

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710039

JAE-AMTAX00000330

(i)     To incur indebtedness for money borrowed on the general credit of the Partnership, except as specifically permitted by Article III or Article X, or

(ii)     Following completion of construction of and rehabilitation of the Improvements, to construct any new capital improvements, or to replace any existing capital improvements if construction or replacement would substantially alter the use of the Property, or

(iii)     To acquire any real property in addition to the Property (other than easements or similar rights necessary or convenient for the operation of the Project), or

(iv)     To bear, or cause or permit any Related Person to bear, the economic risk of loss with respect to all or any portion of any Permanent Mortgage Loan or the indebtedness secured thereby, [except as provided in Article IIIA,] or

(v)     To cause the Partnership to make any loan or advance to any Person (for purposes of this clause 7.1B(v), accounts receivable in the ordinary course of business from Persons other than the General Partners or their Affiliates shall not be deemed to be advances or loans), or

(vi)     To lease any Low Income Unit in the Project to other than Qualified Tenants or otherwise operate the Project in such a manner or take any action which could cause any Low Income Unit in the Project to fail to be treated as a qualified low-income housing unit under Section 42(i)(3) of the Code or which would cause a Recapture Event, or

(vii)     To amend any Project Document, or to permit any party thereunder to waive any provision thereof, to the extent that the effect of such amendment or waiver would be to eliminate, diminish or defer any obligation or undertaking of the Partnership, the General Partners or their Affiliates which accrues, directly or indirectly, to the benefit of, or provides additional security or protection to, the Investor Limited Partner (notwithstanding that the Investor Limited Partner is neither a party to nor express beneficiary of such provision or was not a Partner when such provision became effective), or

(viii)     To increase or refinance any Mortgage or to sell or convey the Property, except as provided in Article IIIC, and except that the General Partners may cause the Partnership to grant easements and similar rights affecting the Land to obtain utility services for the Project or for other purposes necessary or convenient for the operation of the Project, or

(ix)     To cause the Partnership to commence a proceeding seeking any decree, relief, order or appointment in respect to the Partnership under the federal bankruptcy laws, as now or hereafter constituted, or under any other federal or state bankruptcy, insolvency or similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) for the Partnership or for any substantial part of the Partnership's business or property, or to cause the Partnership to consent to any such decree, relief, order or appointment initiated by any Person other than the Partnership, or

(x)     To pledge or assign any of the Capital Contribution of the Investor Limited Partner or the proceeds thereof, or

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710040

JAE-AMTAX00000331

(xi)     To amend any of the Related Agreements; or

(xii)    To approve any changes to the plans and specifications for the Project which would result, either individually or in the aggregate, in an overall development cost increase in excess of $25,000.00 or to make material modifications to the Approved Tax Credit Application (provided, however, that any Consent of the Investor Limited Partner required under this clause (xii) shall not be unreasonably withheld.).

C.     The General Partners shall not (a) cause the Partnership to utilize Cash Flow to acquire interests in other Limited Partnership's or (b) cause the Partnership to invest or reinvest the proceeds of any sale or refinancing of the Project.

Section 7.2    Independent Activities

Any Partner may engage independently or with others in other business ventures of every nature and description including, without limitation, the ownership, operation, management, and development of real estate, regardless of whether such real estate directly competes with the Project, and neither the Partnership nor any Partner shall have any rights by reason of this Agreement in and to such independent ventures or the income or profits derived therefrom.

Section 7.3    Business Management and Control; Designation of Managing General Partner.

A.     Except as otherwise set forth in this Agreement, the Managing General Partner, within the authority granted to it under this Agreement, shall have full, complete and exclusive discretion to manage and control the business of the Partnership for the purposes stated in Article III, shall make all decisions affecting the business of the Partnership and shall manage and control the affairs of the Partnership to the best of its ability and use best efforts to carry out the purpose of the Partnership. In so doing, the Managing General Partner shall take all actions necessary or appropriate to protect the interests of the Limited Partners and of the Partnership. The Managing General Partner shall devote such time as is necessary to the affairs of the Partnership. The Managing General Partner may, in the proper and reasonable exercise of its management authority, delegate certain of it powers, rights and obligations hereunder and may appoint, employ, contract or otherwise deal with any person for the transaction of business of the Partnership, which person may under the supervision of the Managing General Partner perform any acts or services for the Partnership which the Managing General Partner may approve.

B.     Except as otherwise set forth in this Agreement and subject to the applicable Lender and/or Agency rules and regulations and the provisions of the Project Documents, as to those matters not reserved to the Managing General Partner under this Agreement, the General Partners (other than the Additional General Partner) acting unanimously (acting for and on behalf of the Partnership), in extension and not in limitation of the rights and powers given by law or by the other provisions of this Agreement, shall, in their sole discretion, have the full and entire right, power and authority in the management of the Partnership business to do any and all acts and things necessary, proper, convenient or advisable

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710041

JAE-AMTAX00000332

to effectuate the purpose of the Partnership. In furtherance and not in limitation of the foregoing provisions, the General Partners (other than the Additional General Partner) are specifically authorized and empowered to execute and deliver, on behalf of the Partnership, the Loan Agreement, the Regulatory Agreement, the Extended Use Agreement, the Construction Mortgages, the Mortgage, and the other Project Documents, and to execute any and all other instruments and documents, and amendments thereto, as shall be required in connection with the Construction Loan and the Mortgage Loan, including, but not limited to, executing any mortgage, note, contract, building loan agreement, bank resolution and signature card, release, discharge, or any other document or instrument in any way related thereto or necessary or appropriate in connection therewith. Except as otherwise set forth in this Agreement, all decisions made for and on behalf of the Partnership by the General Partners (other than the Additional General Partner) acting unanimously shall be binding upon the Partnership. No person dealing with the General Partners shall be required to determine its or their authority to make any undertaking on behalf of the Partnership, nor to determine any facts or circumstances bearing upon the existence of such authority. Notwithstanding anything to the contrary herein, in the event that at any time there is appointed a Substitute General Partner such Person shall have the right, acting alone and without the Consent or approval of any other General Partner, to take any action or make any decision authorized under this Agreement to be taken or made by a General Partner and no other General Partner shall have any power or right to act alone.

C.     The Managing General Partner shall provide regular, continuous and substantial services to the Partnership and shall materially participate (within the meaning of Section 469 of the Internal Revenue Code of 1986, as amended) in the development of the Apartment Complex and the operations of the Partnership.  In addition to any other duties and obligations specifically assigned or reserved to the Managing General Partner under this Agreement, the Managing General Partner shall perform the following services on behalf of the Partnership; (i) determine the particular requirements of low-income families and the manner in which the Apartment Complex can be developed in a cost-effective manner best to serve such needs including sizes and configurations of apartment units, furnishings and appliances, recreational needs, security, rules and regulations essential to the development of the Apartment Complex; (ii) coordinate with local service agencies, including housing authorities, welfare and social services department, churches and other organizations operating for the purpose of assisting the needy, regarding the availability of the Apartment Complex as desirable housing for low-income families, and facilitate the referral of potential tenants to the Apartment Complex; (iii) oversee and supervise the Management Agent; (iv) select the services which will be provided to such tenants by the Partnership; (vi) select, coordinate, and implement social and educational services from the community which will be provided to tenants at the Apartment Complex; and (vii) use its best efforts to effect and monitor compliance of the Partnership and the Apartment Complex with all governmental regulations applicable thereto (including without limitation making appropriate administrative filings).  In addition, the Managing General Partner shall be responsible for ensuring that the Apartment Complex and the operation thereof at all times comply and are in conformance with Section 4(b) and 5 of Article XIII of the Constitution of the State of California and Sections 214, 254.5 and 259.5 of the California Revenue and Taxation Code, as amended.

D.     CTCAC Administrative Matters. The Managing General Partner shall cause to be prepared and processed the Tax Credit application with the Agency and shall

supervise and conduct all activities reasonably necessary to secure Tax Credits for the Apartment Complex.

        E.    <u>Governmental Compliance</u>. The Managing General Partner shall effect and monitor the compliance of the Partnership and the Apartment Complex with the governmental regulations applicable thereto. Those efforts shall include making appropriate administrative filings and monitoring the income and other qualifications of tenants.

        F.    <u>Property Management</u>. The Managing General Partner on behalf of the Partnership will diligently enforce all of the obligations of the Management Agreement. The day-to-day operational management of the Property shall be carried out by the Management Agent supervised by the Managing General Partner and approved by the Partnership.

        G.    <u>Rehabilitation</u>. Subject to the continued oversight and supervision of the Managing General Partner, the Co-General Partner shall be responsible for the rehabilitation of the Project and for its timely completion, and shall be responsible for overseeing the Contractor pursuant to the Construction Contract.

        H.    <u>Limit on Liability of Managing General Partner</u>.  Not withstanding anything to the contrary set forth in this Agreement or any related or ancillary agreements between the parties, written or oral, the liability of the Managing General Partner to the Partners, the Partnership or to any third person, in all instances hereunder, shall be limited solely to the interest of the Managing General Partner in the Partnership including any interest that the Managing General Partner may now have or in the future may have or any right to payment (now or in the future) of any fees, distributions or any other items of compensation under this Agreement or the Property Documents (the "Managing General Partner Interest"). The liability of the Managing General Partner hereunder shall not, in any event, extend to, or be enforceable against, any other assets of the Managing General Partner or any other officers, directors, employees, or representative of the Managing General Partner.

Section 7.4    <u>Duties and Obligations of the General Partners</u>

        A.    The General Partners shall use their best efforts to carry out the purposes, business and objectives of the Partnership referred to in Section 2.3, and shall devote to Partnership business such time and effort as may be necessary to (i) supervise the activities of the Management Agent, (ii) make inspections of the Project to determine if the Project is being properly maintained and that necessary repairs are being made thereto, (iii) prepare or cause to be prepared all reports of operations which are to be furnished to the Partners or which are required by any Lender or Agency, (iv) elect to defer the commencement of the Credit Period for all or any portion of the Federal Housing Tax Credit allowable to the Partners under Section 42(g) of the Code, to the extent that any such deferral may be in the best economic interest of the Investor Limited Partner or shall otherwise be requested by the Investor Limited Partner, (however, such deferral shall not serve to reduce any Credit Deficiency) (v) cause the Project to be insured against fire and other risks covered by such insurance in the maximum amount required by any Lender and/or the Agency or, following termination of the Regulatory Agreement, good management practices, in any event in an amount equal to the full replacement value of the Improvements, (vi) obtain and keep in force during the term of the

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710043

JAE-AMTAX00000334

Partnership adequate business or rental interruption and workmen's compensation insurance satisfactory to each Lender and Agency, (vii) obtain and keep in force during the term of the Partnership public liability insurance for the benefit of the Partnership and its Partners in amounts from time to time reasonably acceptable to the Agency and the Lenders, (viii) enforce all contracts entered into for the benefit of the Partnership, (ix) rehabilitate and operate the Property in compliance with all applicable Hazardous Waste Laws, and (x) do all other things which may be reasonably necessary to manage the affairs and business of the Partnership. Further, in the event of any casualty and provided that the insurance proceeds shall be made available therefor, the General Partners shall repair any damage to the Project which was caused by such event, so as to restore the Project (as nearly as possible) to the condition and status thereof immediately prior to such occurrence. All of the insurance policies required by this Section 7.4A shall (a) be written by insurance companies rated A or better by Best's, (b) include AMTAX as a named insured, and (c) include a provision requiring the insurance company to notify AMTAX in writing 30 days prior to the cancellation of any such policy. In addition, the General Partners shall promptly provide AMTAX or its representatives with copies of such insurance policies upon request from time to time. The General Partners shall review regularly all of the Partnership and Project insurance coverage to insure that it is adequate. In particular, the General Partners shall review at least annually the insurance coverage required by Section 7.4A(v) to insure that it is in an amount at least equal to the then current full replacement value of the Improvements.

B.      Subject to the terms of the Project Documents and to the requirements of Section 42 of the Code, the General Partner shall use reasonable efforts consistent with sound management practice to cause the Project to maximize income produced by the Project, including, if necessary, seeking any necessary approvals of, and implementing, appropriate adjustments in the rent schedule of the Property.

C.      The General Partner shall hold for occupancy such percentage of the apartments in the Project in such a manner as to qualify the apartment units comprising the Project as a "qualified low income housing project" under Section 42(g) of the Code as interpreted from time to time in regulations and rulings promulgated thereunder. The General Partners shall not take any action which would cause the termination or discontinuance of the qualification of the Project as a "qualified low income housing project" under Section 42(g) of the Code or which would cause the recapture of any Federal Housing Tax Credit without the Consent of the Investor Limited Partner.

D.      The Managing General Partner shall prepare and submit, or cause to be prepared and submitted, to the Secretary of the Treasury (or any other Agency designated for such purpose), on a timely basis, any and all annual reports, information returns and other certifications and information and shall take any and all other action required (i) to insure that the Partnership (and its Partners) will continue to qualify for the Federal Housing Tax Credit for all Low Income Units in the Project and (ii) unless the Consent of the Investor Limited Partner is received to act otherwise in a particular instance, to avoid a Recapture Event.

E.      The General Partners agree that, except as provided in or contemplated by the Commitments, neither they nor any Related Person will at any time bear the economic risk of loss for payment of any Permanent Mortgage Loan. The General Partners agree that they

New D\Victoria Heights\LP.6                    40

JAE-AMTAX00000335

will not cause any Limited Partner at any time to bear the economic risk of loss for payment or performance under any Note or Mortgage; provided, however, that the Limited Partners shall be liable for the performance of their obligations set forth in this Agreement. Each Limited Partner agrees not to take any action which would cause it to bear the economic risk of loss for payment of any Mortgage Loan.

F.     The General Partners shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in their immediate possession or control. The General Partners shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership. In addition, the Managing General Partner will insure that adequate insurance coverage is maintained at all times including liability insurance of not less than $3,000,000.00 per occurrence, including fire, theft, hazard and liability insurance for replacement costs and flood insurance, all such policies shall have the Investor Limited Partner named as an additional Insured. In addition, the Investor Limited Partner is requiring a seismic report and may require earthquake insurance pending review of the seismic report.  If required, the policy shall cover at least 22% of the replacement cost of the Apartment Complex and shall have a maximum deductible equal to five percent (5%) of the policy.  The General Partner guarantees to keep an earthquake insurance policy acceptable to the Investor Limited Partner in place during the entire Compliance Period as defined in the Code.

G.     No General Partner shall contract away the fiduciary duty owed at common law to the Limited Partners.

H.     The General Partners shall (i) not knowingly store (except in compliance with applicable Hazardous Waste Laws) or dispose of any Hazardous Material at the Project, or at or on any other Facility or Vessel owned, occupied, or operated either by any General Partner, any Affiliate of a General Partner, or any Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible; (ii) neither directly nor indirectly knowingly transport or arrange for the transport of any Hazardous Material (except in compliance with applicable Hazardous Waste Laws); (iii) provide the Limited Partners with written notice (x) upon any General Partner's obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Material at or from the Project or any other Facility or Vessel owned, occupied, or operated by any General Partner, any Affiliate of a General Partner or any Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible or whose liability may result in a lien on the Project; (y) upon any General Partner's receipt of any notice to such effect from any Federal, state, or other governmental authority; and (z) upon any General Partner's obtaining knowledge of any incurrence of any expense or loss by any such governmental authority in connection with the assessment, containment, or removal of any Hazardous Material for which expense or loss any General Partner may be liable or for which expense or loss a lien may be imposed on the Project.

I.     Notwithstanding the foregoing, at any time after the fifteenth anniversary of the first day of the first taxable year of the applicable Tax Credit Compliance Period and after the expiration of the option period, the Investor Limited Partner may request that the Managing General Partner do one of the following: (i) sell the Apartment Complex to a third party, or (ii)

New D\Victoria Heights\LP.6

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710045

JAE-AMTAX00000336

purchase or arrange for a third party to purchase, the Limited Partners Interests in the Partnership for the fair market value of the Interests, but in all events such purchase and sale shall be for terms which are approved by the Investor Limited Partner. The Co-General Partner shall have a period of two (2) years after the receipt of such request from the Investment Limited Partner in which to use its best efforts in order to close the purchase or sale of the Apartment Complex or Partnership Interests, as the case may be, it being understood and agreed that no such purchase or sale shall take place prior to the close of the Tax Credit "compliance period" with respect to the Apartment Complex (as defined in Section 42(i) of the Code). After receipt of a request from the Investment Limited Partner, the Co-General Partner shall determine which course of action it desires to utilize. If it determines to locate a third party purchaser, the terms of such purchase of either the Apartment Complex or Interests shall be subject to the Investment Limited Partner's Consent.  The purchase price of the Apartment Complex or the Investor Limited Partner Interest under this section, as the case may be, shall be equal to the fair market value of the Apartment Complex or the Interest, as the case may be. Fair market value shall be determined by the Investor Limited Partner and the Administrative General Partner, as the case may be, each retaining an appraisal from a qualified MAI appraiser. In the event that the two appraisers do not agree on the fair market value, the appraisers shall agree on the appointment of a third appraiser, whose appraisal shall be binding on the parties, provided however, that the Investor Limited Partner shall not be obligated to Consent to a sale in the event that it is not satisfied with the purchase price so determined by the foregoing process or by the other terms of the purchase and sale. In the event that the purchase price and other terms are satisfactory to the Investor Limited Partner, the purchase and sale of the Apartment Complex or Interests, as applicable, shall be closed within a period of ninety (90) days after such price has been determined, but in no event earlier than the close of the "compliance period".

Section 7.5    <u>Representations and Warranties; Certain Indemnities</u>

A.     The Managing General Partner, to the extent of its actual knowledge, and Co-General Partner hereby, severally but not jointly, represent and warrant to the Investor Limited Partner that the following are true as of the date hereof and will be true on the due date for each Installment:

(i)     The Partnership is a duly organized limited partnership validly existing under the laws of the State and has complied with all recording requirements with each proper governmental authority necessary to establish the limited liability of the Limited Partners as provided herein.

(ii)     No litigation or proceeding against the Partnership, any General Partner, the Builder or the Developer, nor any other litigation or proceeding directly affecting the Project, is to its knowledge pending before any court, administrative agency or other governmental authority which would, if adversely determined, have a material adverse effect on the Partnership, any General Partner, the Builder, the Developer or their respective businesses or operations, except for such matters as to which the likelihood of such a determination adverse to the Partnership is, in the opinion of Partnership Counsel or other counsel acceptable to the Investor Limited Partner, remote.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710046

JAE-AMTAX00000337

(iii)　(a)　No default by any General Partner, any Affiliate thereof having any relationship with the Project, or the Partnership, in any material respect has occurred or is continuing (nor has there occurred any continuing event which, with the giving of notice or the passage of time or both, would constitute such a default in any material respect) under any of the Project Documents.

(b)　The Project Documents are in full force and effect (except to the extent fully performed in accordance with their respective terms).

(c)　All operating and replacement reserves are fully funded to the extent required by the Project Documents and this Agreement.

(d)　No default under the Bond Documents has occurred or is continuing.

(iv)　No Partner or Related Person bears the economic risk of loss with respect to the indebtedness evidenced by any Note and secured by any Mortgage, except as permitted by Article IIIA.

(v)　All building, zoning and other applicable certificates, permits and licenses necessary to permit the construction, rehabilitation, repair, use, occupancy and operation of the Project have been obtained (other than prior to completion of the Project or a specified portion thereof, such as will be issued only after the completion of the Project or such specified portion thereof) and neither the Partnership nor the General Partners have received any notice or has any knowledge of any violation with respect to the Project of any law, rule, regulation, order or decree of any governmental authority having jurisdiction which would have a material adverse effect on the Project or the construction, rehabilitation, use or occupancy thereof, except for violations which have been, or will be, cured and notices or citations which have been withdrawn or set aside by the issuing agency or by an order of a court of competent jurisdiction.

(vi)　The Partnership owns the fee simple interest in the Property and has good and marketable title thereto, free and clear of any liens, charges or encumbrances other than the Mortgage[s], matters set forth in the Title Policy delivered at Investment Closing, encumbrances the Partnership is permitted to create under Sections 2.4 and 7.1, and mechanics' or other liens which have been bonded or insured or reserved against in such a manner as to preclude the holder of such lien or such surety or insurer from having any recourse to the Property or the Partnership for payment of any debt secured thereby. None of the liens, charges, encumbrances or exceptions set forth in the Title Policy delivered at Investment Closing has or will have a material adverse effect upon the construction or operation of the Project.

(vii)　The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken or to be made or taken, pertaining to the Partnership or the Property by any General Partner or Affiliate thereof which is a corporation have been or will be duly authorized by all necessary corporate or other action, and the consummation of any such transactions with or on behalf of the Partnership will not constitute a breach or violation of, or a default under, the charter or by-laws of any such corporation or any

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710047

JAE-AMTAX00000338

agreement by which any such corporation or any of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree. Each such corporation is duly organized and validly existing under the law of the state of its incorporation.

(viii)   No Managing General Partner or Co-General Partner is in default in any material respect in the observance or performance of any provision of this Agreement to be observed or performed by such General Partner.

(ix)   The Related Agreements are in full force and effect and no default by any party thereto (other than AMTAX or its Affiliates) has occurred or is continuing thereunder (nor has there occurred any event which, with the giving of notice or the passage of time, or both, would constitute such a default in any material respect thereunder).

(x)   No Event of Bankruptcy has occurred and is continuing with respect to the Partnership, any General Partner, its Affiliates, the Developer, its Affiliates or the Purchaser.

(xi)   The entire Project will qualify, or on and after the Completion Date qualifies, as a "qualified low-income housing project" under Section 42(g) of the Code and all Units in the Project will qualify as Low-Income Units as defined under Section 42 of the Code.

(xii)   The General Partner(s) is not insolvent as defined in the Uniform Fraudulent Transfer Act or such other fraudulent conveyance law as may be applicable under the laws of the State;

(xiii)   All tax returns, financial statements, Schedules K-1 and reports due under Article XII have been properly filed and/or transmitted, as applicable.

(xiv)   No General Partner, Affiliate of a General Partner or Person for whose conduct any General Partner is or was responsible has ever: (i) knowingly owned, occupied, or operated a Facility or Vessel on which any Hazardous Material was or is stored, transported, or disposed of (except if such storage, transport or disposition was or is at all times in compliance with applicable Hazardous Waste Laws); (ii) directly or indirectly knowingly transported, or arranged for transport, of any Hazardous Material (except if such transport was or is at all times in compliance with applicable Hazardous Waste Laws); (iii) caused or was legally responsible for any release or threat of release of any Hazardous Material; (iv) received notification from any Federal, state or other governmental authority of (x) any potential, known, or threat of release of any Hazardous Material from the Project or any other Facility or Vessel owned, occupied, or operated by any General Partner, Affiliate of a General Partner, or Person for whose conduct any General Partner or Affiliate of a General Partner is or was responsible or whose liability may result in a lien on the Project; or (y) the incurrence of any expense or loss by any such governmental authority or by any other Person in connection with the assessment, containment, or removal of any release or threat of release of any Hazardous Material from the Project or any such Facility or Vessel.

(xv)   To the best of the Managing General Partners and Co-General Partner's knowledge, no Hazardous Material was ever or is now stored on, transported or

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710048

JAE-AMTAX00000339

disposed of on the Land (except to the extent any such storage, transport or disposition was at all times in compliance with all Hazardous Waste Laws).

(xvi)   The amount of the maximum annual Federal Housing Tax Credit to the Partnership shall be at least $236,019.

(xvii)   Bonds have been or will be properly issued for the benefit of the Project in accordance with Section 142 (d) of the Code and the Project is or will be financed in accordance with Section 42(h)(4) of the Code. The Partnership will comply with the requirements of the Bond Documents, including owning and operating the Project as a "qualified residential rental project" within the meaning of Section 142(d) of the Code for the required period.

(xviii)   At least 50% or more of the aggregate basis of the land and building is financed with tax-exempt bond proceeds, and the entire project is eligible for credits without receiving a LIHC allocation.

B.   The Co-General Partner agrees to promptly indemnify, defend and hold harmless the Partnership and the Limited Partners from and against any and all claims, losses, damages and liabilities (as well as from and against any and all attorneys' fees and other costs and expenses incurred in connection therewith) which the Partnership and the Limited Partners may incur by reason of any liabilities to which either the Partnership or the Project is subject at the Admission Date; provided, however, that the foregoing indemnification shall not apply to any Mortgage, necessary contractual obligations normally incurred pursuant to the Commitments in connection with the operation of the Property, or to acts for which the General Partners are entitled to indemnification under Section 7.6.

C.   The Co-General Partner agrees promptly to indemnify, defend, and hold harmless the Partnership and the Limited Partners from and against any claim, loss, damage or liability (as well as from and against any and all attorneys' fees and other costs and expenses incurred in connection therewith) on account of the presence or escape of any Hazardous Material at or from the Property (or at any other location). Any claim, loss, damage or liability described in the immediately preceding sentence may be defended, compromised, settled, or pursued by the Limited Partners with counsel of the Limited Partners' selection, but at the expense of the Co-General Partner. Notwithstanding anything else set forth in this Agreement, this indemnification shall survive the withdrawal of any Co-General Partner and/or the termination of this Agreement.

D.   The General Partner(s) acknowledges familiarity with recently issued technical advice memoranda 200043015, 200043016, 200043017, 200044004 and 200044005 and has discussed the substance of the memoranda rulings with its tax advisor and represents and warrants that the Project meets the requirements of Section 42(h)(1)(E) taking into consideration those rulings.

Section 7.6   Indemnification

Each General Partner (including any Retired General Partner) shall be indemnified by the Partnership against any losses, judgments, liabilities, expenses and amounts paid in

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710049

JAE-AMTAX00000340

settlement of any claims sustained by him or it in connection with the Partnership from parties other than the Partnership or the Investor Limited Partner, provided that the same were not the result of: (w) willful misconduct, (x) incompetence, (y) reckless disregard for the Partnership's welfare, (z) or dereliction of duty, on the part of the General Partner or any of its "Designated Affiliates" (as such term is defined in Section 7.7B.) and were the result of a course of conduct which the General Partners, in good faith, determined was in the best interest of the Partnership. Any indemnity under this Section 7.6 shall be provided out of and to the extent of Partnership assets only, and no Limited Partner shall have any personal liability on account thereof; provided, however, that no indemnification shall be provided for any losses, liabilities or expenses arising from or out of any alleged violation of federal or state securities laws unless (1) there has been a successful adjudication on the merits of each count involving alleged securities law violations as to the particular indemnitee and the court approves indemnification of litigation costs; (2) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee and the court approves indemnification of litigation costs; or (3) a court of competent jurisdiction approves a settlement of the claims against a particular indemnitee and finds that indemnification of the settlement and related costs should be made. In any claim for indemnification in connection with a settlement which was so approved, the party seeking indemnification shall place before the court the position of the Securities and Exchange Commission and the relevant State Securities Commission and any state securities administrator whose rules or published policies require such disclosure with respect to the issue of indemnification for securities law violations.

The Partnership shall not incur the cost of that portion of any insurance which insures any party against any liability as to which such party is herein prohibited from being indemnified.

Section 7.7    Liability of General Partners to Limited Partners

A.     No General Partner or Designated Affiliate (as defined in Section 7.7B) shall be liable, responsible or accountable for damages or otherwise to the Partnership or to any Limited Partner for any loss suffered by the Partnership which arises out of any action or inaction of such General Partner or Designated Affiliate if that General Partner or Designated Affiliate, in good faith, determined that such course of conduct was in the best interests of the Partnership and such course of conduct did not constitute willful misconduct, incompetence, reckless disregard for the Partnership's welfare or dereliction of duty on the part of that General Partner or Designated Affiliate.

B. As used in Sections 7.6 and 7.7, a "Designated Affiliate" is any Person performing services on behalf of the Partnership who: (1) directly or indirectly controls, is controlled by, or is under common control with any General Partner, (2) owns or controls 10% or more of the outstanding voting securities of any General Partner, (3) is an officer, director, partner or trustee of any General Partner, or (4) if any General Partner is an officer, director, partner or trustee, of any company for which the General Partner acts in any such capacity.

C. Limitation on Liability as to the Managing General Partner. Notwithstanding anything to the contrary set forth in this Agreement, any related agreement or any other agreements between the parties, written or oral, the liability of the Managing General Partner to

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710050

JAE-AMTAX00000341

the Partners or to the Partnership, or to any third party, in all instances hereunder shall be limited solely to the interest of the Managing General Partner in the Partnership including any interest the Managing General Partner may now have or in the future may have or any right to payment (now or in the future) of any fees, distributions or other items of compensation under this Agreement or the Project Documents. The liability of the Managing General Partner hereunder shall not, in any event, extend to, or be enforceable against any other assets of the Managing General Partner or any officers, directors, employees, or representatives of the Managing General Partner.

Section 7.8     Reserves

A.     The Managing General Partner and Co-General Partner shall establish all reserves required by any of the Project Documents and maintain them in accordance with the terms thereof.

B.     Additionally, the Co-General Partner shall establish an initial operating reserve account (at a date no later than that of the Fourth Installment as set forth in Section 5.1A) in the amount of $120,000, to provide for operating deficits which shall be funded by the Co-General Partner. In the event that the Co-General Partner must fund any amount of this reserve, the amount funded by the Co-General Partner is to be treated as a "Subordinated Loan", except that any maximum annual repayment amount may not exceed ¼ of the initial amount funded with the Subordinate Loan and repayment will not begin until after tax returns and audits for one full year of operations are completed. The initial amount must be maintained annually with the minimum balance to be funded by operations cash flow or additional "Subordinated Loans" if necessary. All distributions from this account must be authorized by the Investment Company. If the Permanent Lender requires additional operating and / or debt service reserves, the required Operating Reserve Account may be used to fund all or part of lenders requirements only upon the Investment Limited Partner's approval.

Upon completion of the first year following payment of the Fourth Installment being earned and subject to the Property operating at a 1.20 debt coverage ratio for at least six (6) consecutive months, the Operating Reserve Account may be reduced by $30,000 annually. Any cash available due to such reduction is to be released to the Partnership's Cash Flow annually until the fund is depleted. These reductions will be subject to the Property maintaining a minimum 1.15 debt coverage ratio. Notwithstanding the above, $50,000 of the Operating Reserve Account shall not be released until receipt by the Partnership of a HAP (Section 8) contract that extends past the Compliance Period and all of the conditions for release set forth in this paragraph have also been met.

C.     Additionally, the Managing General Partner shall establish a reserve account for capital replacements, which account shall be funded by annual deposits of $275 per apartment unit in the Project per year (as adjusted annually by the C.P.I.) (in equal monthly installments beginning at the time of the Third Installment as set forth in section 5.1A). Withdrawals from such reserve shall be utilized solely to fund capital repairs and improvements, deemed necessary by the Managing General Partner and, except in the case of withdrawals of $5,000 or less for emergencies only, may be made consistent with HUD

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710051

JAE-AMTAX00000342

procedures. All withdrawals must be disclosed in writing to the Investor Limited Partner within 14 days thereof.

Section 7.9    Obligation To Provide for Project Expenses

The Co-General Partner and / or the Managing General Partner, as applicable, agrees that if the Partnership requires funds, to (i) discharge Project Expenses (other than to make payments to Partners, payments of any outstanding Subordinated Loans or other obligations herein provided to be payable solely out of Cash Flow or distributions of Capital Proceeds) during or in respect of the period commencing on the Admission Date or to comply with Tax Credit rules or regulations, (ii) pay the Asset Management Fee or (iii) assure maintenance by the Partnership of Surplus Cash of at least $1.00 at all times during such period, the Co-General Partner shall furnish to the Partnership the funds required (the "Expense Obligations). Amounts so furnished shall constitute Subordinated Loans. Any such Subordinated Loan shall not be interest-bearing and shall be repayable only as provided in Article VI.

Failure to timely pay any Expense Obligations at any time shall be grounds for removal of the General Partners from the Partnership. However, if the removal is initiated against the General Partners after the Release Date for failure to timely pay any Expense Obligations, the General Partners shall not be liable for any accrued but unpaid Expense Obligations initially arising after the Release Date, such subsequent amount to be forgiven upon the uncontested removal of the General Partners from the Partnership.

Section 7.10    Certain Payments to the General Partners and Affiliates

A.    For its services in connection with the development of the Property and the supervision to completion of the construction of the Improvements and as reimbursement for Development Advances, the Developer shall be entitled to receive the amounts set forth in the Development Agreement.

B.    All of the Partnership's expenses shall be billed directly to, and paid by, the Partnership to the extent practicable. Subject to the terms of this Agreement, reimbursements to a General Partner or any of its Affiliates by the Partnership shall be made subject to the following conditions:

(i)    such goods or services must be necessary for the prudent formation, development, organization or operation of the Partnership;

(ii)    reimbursement for goods or services provided by Persons who are not affiliated with a General Partner shall not exceed the cost to a General Partner or its Affiliates of obtaining such goods or services; and

(iii)    reimbursement for goods and services obtained directly from a General Partner or its Affiliates shall not exceed the amount the Partnership would be required to pay independent parties for comparable goods and services in the same geographic location.

C.    The Partnership shall pay to the Managing General Partner an annual non-cumulative Partnership Management Fee in an amount equal to 0.6% of the Investment

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710052

JAE-AMTAX00000343

Company's Capital Contribution. The Partnership Management Fee shall be payable solely from Cash Flow or Capital Proceeds as provided in Section 6.2A.

D.   The Partnership shall pay to the Co-General Partner an Incentive Supervisory Fee from either (a) "Distributions of Cash Flow" in accordance with Section 6.2(A); or (b) from "Distributions from a Sale or Refinancing", in accordance with Section 6.2(B), as the case may be, in an amount equal to fifteen percent (15%) of the Gross Revenues of the Partnership.

E.   The Partnership shall pay to the Managing General Partner an annual compliance monitoring fee (the "Compliance Monitoring Fee) in the amount of $15,000 per annum, if available from Cash Flow as provided in Section 6.2 A.

F.   Neither the General Partners nor any of their Affiliates shall be entitled to any other compensation, fees or profits from the Partnership in connection with the acquisition, construction, development or rent-up of the Land or Improvements or for the administration of the Partnership's business or otherwise, except for (i) payments provided for or referred to in Sections 2.4(v) or 7.10, (ii) payments of the Management Fee referred to in Article XI or the Incentive Supervisory Fee and Development Fee set forth in the Development Agreement, (iii) fees and distributions under Article VI and (iv) such other fees and distributions as otherwise stated herein, or as negotiated with the Limited Partner or as may be permitted to be paid by the Lenders or the Agency out of the proceeds of any Mortgage Loan.

Section 7.11   Several Obligations

Subject to Section 7.7C, any obligations of a General Partner hereunder are several but not joint obligations of the General Partners, except as herein expressly provided to the contrary. Protech shall be indemnified as to all joint and several liabilities of the Partnership.

Section 7.12   Grant of Security Interest

In order to secure the performance by the General Partners and the Developer of their obligations to the Investor Limited Partner under this Agreement and all other agreements or instruments delivered concurrently herewith, the General Partners and the Developer hereby collaterally assign to the Investor Limited Partner all amounts otherwise payable to the General Partners and the Developer under this Agreement and the Development Agreement (as fees, distributions or otherwise), which assignment shall be deemed a grant of a security interest. The General Partners and the Developer hereby represent and warrant to the Investor Limited Partner that the security interest granted hereunder is and shall remain a perfected first security interest in the collateral herein described subject and subordinate, if applicable, to the Bond Documents and the Permanent Mortgage Loan. At the request of the Investor Limited Partner, the General Partners and the Developer shall execute such documents and take such other actions as may be necessary or appropriate in the discretion of the Investor Limited Partner to further evidence and perfect the security interest granted hereby.

Notwithstanding any of the foregoing, unless and until there occurs an event of default of a material obligation of the Managing General Partner, Co-General Partner or Developer hereunder which remains uncured after expiration of the applicable cure period, the Investor

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710053

JAE-AMTAX00000344

Limited Partner agrees to forebear exercising its right to Developer Fees payable to Developer or the General Partners, and the Developer or the General Partners shall have the right to receive all Developer Fees and retain and enjoy the same not otherwise needed to complete the development of the project.

Section 7.13   Tax Matters Partner

A.   The Tax Matters Partner ("TMP") for the Partnership shall be the Co-General Partner serving in such capacity from time to time.

B.   The TMP shall have the right to resign as the TMP by giving thirty (30) days written notice to each Partner, provided there is another General Partner willing to serve in such capacity. Upon the resignation, death, legal incompetency or Event of Bankruptcy of the Person serving as the TMP, any successor to the interest of the TMP pursuant to the applicable provisions of this Section 7.9 shall be designated as the successor TMP, but such designee shall not become the TMP until the designation of such Person has been approved by the Consent of the Investor Limited Partner, which consent shall not be unreasonably withheld or delayed.

C.   The TMP shall employ experienced tax counsel to represent the Partnership in connection with any audit or investigation of the Partnership by the Service, and in connection with all subsequent administrative and judicial proceedings arising out of such audit. The fees and expenses of such counsel shall be a Partnership expense and shall be paid by the Partnership. Such counsel shall be responsible for representing the Partnership; it shall be the responsibility of the General Partners and of the Investor Limited Partner, at their expense, to employ tax counsel to represent their respective separate interests.

D.   The TMP shall keep the Partners informed of all administrative and judicial proceedings, as required by Section 6623(g) of the Code, and shall furnish to each Partner who so requests in writing, a copy of each notice or other communication received by the TMP from the Service (except such notices or communications as are sent directly to such requesting Partner by the Service). All third party costs and expenses incurred by the TMP in serving as the TMP shall be Partnership expenses and shall be paid by the Partnership.

E.   The TMP shall not have the authority, unless such action has been approved by the Consent of the Investor Limited Partner, to do all or any of the following:

(i)   To enter into a settlement agreement with the Service which purports to bind partners other than the TMP,

(ii)   To file a petition as contemplated in Section 6226(a) or 6228 of the Code,

(iii)   To intervene in any action as contemplated in Section 6226(b) of the Code,

(iv)   To file any request contemplated in Section 6227(b) of the Code, or,

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710054

JAE-AMTAX00000345

(v)     To enter into an agreement extending the period of limitations as contemplated in Section 6229(b)(1)(B) of the Code.

F.     The relationship of the TMP to the Investor Limited Partner is that of a fiduciary, and the TMP has a fiduciary obligation to perform its duties in such manner as will serve the best interests of the Partnership and the Investor Limited Partner.

G.     The Partnership shall indemnify the TMP (including the officers and directors of a corporate TMP) from and against judgments, fines, amounts paid in settlement, and expenses (including attorneys' fees) reasonably incurred by them in any civil, criminal or investigative proceeding in which they are involved or threatened to be involved by reason of being the TMP, provided that the TMP acted in good faith, within what is reasonably believed to be the scope of its authority and for a purpose which it reasonably believed to be in the best interests of the Partnership or the Partners. The TMP shall not be indemnified under this provision against any liability to the Partnership or its Partners to any greater extent than the indemnification allowed by Section 7.6 of this Agreement. The indemnification provided hereunder shall not be deemed to be exclusive of any other rights to which those indemnified may be entitled under any applicable statute, agreement, vote of the Partners, or otherwise.

Section 7.14   Special Limited Partner

Unless the General Partners are removed in accordance with the provisions of Section 4.5, the Special Limited Partner shall have no right or authority to act in any capacity on behalf of the Partnership or to represent or bind the Partnership in any capacity or in any manner. If Central Valley Coalition for Affordable Housing shall become unable to serve as Managing General Partner or if there is a Change in Control of the Managing General Partner, a new nonprofit corporation shall be admitted to the partnership as the Managing General Partner subject to the consent of the Investment Company. If JAE Properties, Inc. shall become unable to serve as Co-General Partner or if there is a Change in Control of the Co-General Partner, Protech shall be the Co-General Partner subject to the consent of the Investment Company.

**ARTICLE VIII**
**WITHDRAWAL OF A GENERAL PARTNER; NEW GENERAL PARTNERS**

Section 8.1   Voluntary Withdrawal

A.     No General Partner shall have the right to withdraw or retire voluntarily from the Partnership or sell, assign or encumber his or its Interest without the Consent of the Investor Limited Partner and, if required, any Requisite Approvals.

B.     Notwithstanding the foregoing, a General Partner may at any time propose to the Investor Limited Partner a Person to serve as his or its successor, or if at such time there be more than one General Partner, to serve as a successor to one or more of the General Partners desiring to withdraw. If the Consent of the Investor Limited Partner is obtained, and all Requisite Approvals are obtained to such withdrawal and the admission of such successor, all Partners hereby agree that this Agreement and the Certificate shall be appropriately amended to effect such withdrawal and admission.

JAE-AMTAX00000346

Section 8.2    Right To Continue

In the event of the occurrence of a Terminating Event with respect to any General Partner, the remaining General Partners, if any, and any successor General Partner, shall have the right to elect to continue the business of the Partnership employing its assets and name, all as contemplated by the laws of the State. Within ten (10) days after the occurrence of such Terminating Event, the remaining General Partners, if any, shall notify the Investor Limited Partner thereof and of their decision whether or not to continue the business of the Partnership.

Section 8.3    Successor General Partner

A.    Upon the occurrence of any Terminating Event referred to in Section 8.2, the remaining General Partners may (but are not required to) designate a Person to become a successor General Partner to the General Partner as to whom such event shall have occurred. Any Person so designated, subject to the Consent of the Investor Limited Partner (and, if required by the Act or any other applicable law, the consent of any other Partner so required), shall become a successor General Partner upon its written agreement to be bound by the Project Documents and by the provisions of this Agreement.

B.    If any Terminating Event referred to in Section 8.2 shall occur at a time when there is no remaining General Partner and no successor becomes a successor General Partner pursuant to the preceding provisions of this Section 8.3 or if the remaining General Partners do not elect to continue the business of the Partnership (in which case such Partners shall also be considered "Retired General Partners" for purposes of this Article VIII), then the Investor Limited Partner shall have the right to designate a Person to become a successor General Partner upon his or its written agreement to be bound by the Project Documents and by the provisions of this Agreement.

C.    If the Investor Limited Partner elects to reconstitute the Partnership pursuant to this Section 8.3 and admit a successor General Partner pursuant to this Section 8.3, the relationship of the parties in the reconstituted Partnership shall be governed by this Agreement.

Section 8.4    Interest of Predecessor General Partner

A.    Except as provided in Section 8.3, no assignee or transferee of all or any part of the Partnership Interest of a General Partner shall have any automatic right to become a General Partner. Upon the designation of a successor General Partner (if any) pursuant to Section 8.3, such Partner shall have the option to acquire the predecessor General Partner's Partnership Interest by paying to such General Partner or its representatives the fair market value of such Partnership Interest (provided that if the predecessor General Partner is in violation of any of the covenants or undertakings contained in this Agreement, or has violated any representation or warranty contained herein, the designated successor General Partner may pay such amount into escrow until such violation has been corrected). Any dispute as to such fair market value or as to the final disposition of such amount shall be settled by Arbitration.

B.    If no successor General Partner is designated or if the designated successor General Partner of the predecessor General Partner does not desire to purchase the

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710056

JAE-AMTAX00000347

Partnership Interest of the predecessor General Partner, such Partnership Interest of the predecessor General Partner shall be deemed to be that of a Special Class Limited Partner and the holder thereof shall be entitled only to such rights as the assignee of a Limited Partnership Interest may have as such under the provisions of Section 9.4 hereof, the Uniform Act and other applicable laws of the State.

C.      Upon the occurrence of a Terminating Event as to any General Partner, such General Partner (the "Retired General Partner") shall be deemed to have automatically transferred to the remaining General Partners, in proportion to their respective General Partnership interests, or, if there shall be no remaining General Partners, then to the Partnership for the benefit of the remaining Partners, all or such portion of the General Partnership Interest of such Retired General Partner which, when aggregated with the existing General Partnership Interests of all such remaining General Partners, if any, will be sufficient to assure such remaining General Partners and any successor General Partner a .0045% interest in all Profits, Losses, Tax Credits and distributions of the Partnership under Article VI hereof. No documentation shall be necessary to effectuate such transfer, which shall be automatic. That portion of the General Partnership Interest of the Retired General Partner which shall not have been transferred pursuant to this Section 8.4C shall be retained by such Retired General Partner (or pass to legal representatives of a deceased General Partner) who or which shall have the status of a Special Limited Partner, with no right to receive a share of the Profits, Losses, Tax Credits, and distributions of the Partnership to which the Retired General Partner as such, would have been entitled had such Terminating Event not occurred, and such Retired General Partner (or his legal representatives in the case of a deceased General Partner) shall not be considered to be a Limited Partner for the purpose of sharing the benefits allocated to the Limited Partners under Article VI hereof and shall not participate in the votes or consents of the Limited Partners hereunder. No consideration shall be paid to such Retired General Partner by the remaining General Partners or the Partnership in the event of a Transfer pursuant to this Section 8.4C.

D.      For the purposes of Article VI hereof, the effective date of the transfer pursuant to the provisions of Section 8.4C of the General Partnership Interest of a Retired General Partner shall be deemed to be the date on which such Terminating Event occurs.

E.      Anything herein contained to the contrary notwithstanding, any General Partner who withdraws voluntarily in violation of Section 8.1 or is removed shall remain liable for all of its obligations under this Agreement, for its obligations under the Related Agreements and the Project Documents, for all its other obligations and liabilities hereunder incurred or accrued prior to the date of its withdrawal and for any loss or damage which the Partnership or any of its Partners may incur as a result of such withdrawal, except for any loss or damage attributable to the activities of the remaining and/or successor General Partners subsequent to such withdrawal or removal. Notwithstanding anything herein to the contrary, the Managing General Partner's liability on withdrawal or removal is limited to the loss of its Partnership interest.

F.      The estate (which term, for purposes of this Section 8.4F, shall include the heirs, distributees, estate, executors, administrators, guardian, committee, trustee or other personal representative) of a General Partner who is a natural person as to whom a Terminating Event has occurred shall be and remain liable for all his liabilities and obligations hereunder,

CB__ PARTNERSHIP AGREEMENT; 8-27-01_104710057

JAE-AMTAX00000348

except as provided in this Section 8.4F. In the event of the death, insanity or incompetency of a General Partner who is a natural person, his estate shall remain liable for all his obligations and liabilities hereunder incurred or accrued prior to the date of such event, and for any damages arising out of any breach of this Agreement by him, but his estate shall not have any obligation or liability on account of the business of the Partnership or the activities of the other General Partners after his death, insanity or incompetency unless it elects to become a General Partner pursuant to Section 8.3A.

Section 8.5     Designation of New General Partners

A.     A General Partner may, with the written consent of all Partners, at any time designate one or more new General Partners with such General Partnership Interest(s) as the General Partner may specify.

B.     Any new General Partner shall, as a condition of receiving any interest in Partnership Property, agree to comply with the terms of the Project Documents and by the provisions of this Agreement to the same extent and on the same terms as any other General Partner.

Section 8.6     Amendment of Certificate; Approval of Certain Events

A.     Upon the admission of a new General Partner, pursuant to the preceding provisions of this Article VIII, the Schedule shall be amended to reflect such admission and an amendment to the Certificate, also reflecting such admission, shall be filed in the manner and to the extent required by the Uniform Act.

B.     Each Partner hereby consents to and authorizes any admission or substitution of a General Partner or any other transaction, including, without limitation, the continuation of the Partnership business, which has been authorized by the requisite percentage of Partners under the provisions of this Agreement, subject to the provisions of Section 8.7, and hereby ratifies and confirms each amendment of this Agreement and/or the Certificate necessary or appropriate to give effect to any such transaction.

Section 8.7     Admission of a General Partner

Notwithstanding any other provisions of this Agreement, no Person shall be admitted as an additional or successor General Partner without the written approval of all Partners and, unless prior to consummation of such transaction, the Limited Partners shall have received an opinion of Special Counsel to the effect that the consummation of such transaction will not cause (i) the Partnership to be treated as an "association" for federal income tax purposes, or (ii) the Limited Partners to be deemed to be taking part in the control of the business of the Partnership within the meaning of the Uniform Act.

**ARTICLE IX**
**TRANSFER OF LIMITED PARTNER INTERESTS;**
**ADDITIONAL LIMITED PARTNERS**

Section 9.1     Right To Assign

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710058

JAE-AMTAX00000349

The Investor Limited Partner may not make a voluntary assignment of the whole or any portion of its Partnership Interest without the written consent of the General Partners, which said consent may be withheld with respect to any assignment by the Investor Limited Partner in the sole and absolute discretion of the General Partners until such time as the Investor Limited Partner has paid its Capital Contribution in full and thereafter said consent shall not be unreasonably withheld. Consent to assignments of the Investor Limited Partnership Interest shall be withheld to the extent necessary to preserve the Partnership's tax status and attributes and to comply with securities laws. Notwithstanding the foregoing, in no event shall any assignee of a Limited Partner have any right to become a Substitute Limited Partner without compliance with all applicable provisions of this Article IX.

Section 9.2      Restrictions

A.      No sale or exchange of the Interest of any Person as a Limited Partner shall be made if such sale or exchange would violate the Regulations, except a sale pursuant to the Purchase Agreement.

B.      In no event shall all or any part of a Limited Partner's Interest be assigned or transferred to a minor or to an incompetent.

C.      The General Partners may require as a condition of any assignment of any Interest that the assignor assume all costs incurred by the Partnership in connection therewith.

D.      Any assignment in contravention of any of the provisions of Section 9.1 or this Section 9.2 shall be void and ineffectual and shall not bind, or be recognized by, the Partnership.

Section 9.3      Substitute Limited Partners

A.      No Limited Partner shall have the right to substitute an assignee as a Limited Partner in his place. The General Partners, however, may in their exclusive discretion permit any such assignee to become a Substitute Limited Partner and any such permission by the General Partners shall be binding and conclusive without the consent or approval of any other Person, except, if required, any Requisite Approvals. Any Substitute Limited Partner shall, as a condition of receiving any interest in the Partnership assets, agree to be bound (to the same extent as his assignor was bound) by the Project Documents and by the provisions of this Agreement.

B.      Upon the admission of a Substitute Limited Partner, the Schedule shall be amended to reflect the name and address of such Substitute Limited Partner and to eliminate the name and address of his assignor and, if necessary, an amendment to the Certificate reflecting such admission shall be filed in accordance with the Uniform Act at least once each calendar quarter during which a Substitute Limited Partner is admitted, in order to effect the substitution thereof. Each Substitute Limited Partner shall execute such instrument or instruments as shall be required by the General Partners to signify its agreement to be bound by all the provisions of this Agreement.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710059

JAE-AMTAX00000350

Section 9.4    Assignees

A.    In the event of the death or incapacity or dissolution of any Limited Partner, his or its legal representatives shall have such rights as are afforded them by the Uniform Act. The death or dissolution of a Limited Partner shall not dissolve the Partnership.

B.    An assignee of a Limited Partner who does not become a Substitute Limited Partner in accordance with Section 9.3 shall, if such assignment is in compliance with the terms of this Agreement, have the right to receive the same share of profits, losses and distributions of the Partnership to which the assigning Limited Partner would have been entitled if no such assignment had been made by such Limited Partner.

C.    Any Limited Partner who shall assign all its Interest shall cease to be a Limited Partner of the Partnership, and shall no longer have any rights or privileges or obligations of a Limited Partner except that, unless and until the assignee of such Limited Partner is admitted to the Partnership as a Substitute Limited Partner in accordance with Section 9.3, said assigning Limited Partner shall retain the statutory rights and be subject to the statutory obligations of an assignor limited partner under the Uniform Act as well as the obligation to make the Capital Contributions attributable to the Interest in question, if any portion thereof remains unpaid.

D.    In the event of any assignment of a Limited Partner's Interest as a Limited Partner, there shall be filed with the Partnership a duly executed and acknowledged counterpart of the instrument making such assignment; such instrument must evidence the written acceptance of the assignee to all the terms and provisions of this Agreement; and if such an instrument is not so filed, the Partnership need not recognize any such assignment for any purpose.

E.    In the case of any assignment of a Limited Partner's Interest as a Limited Partner, where the assignee does not become a Substitute Limited Partner, the Partnership shall recognize the assignment not later than the last day of the calendar month following receipt of notice of assignment and required documentation.

F.    An assignee of a Limited Partner's Interest as a Limited Partner who does not become a Substitute Limited Partner as provided in Section 9.3 and who desires to make a further assignment of his Interest shall be subject to the provisions of this Article IX to the same extent and in the same manner as any Limited Partner desiring to make an assignment of its Interest.

Section 9.5    Additional Limited Partners

A.    The General Partners may admit additional Limited Partners only with the Consent of the Investor Limited Partner.

B.    Any incoming Limited Partner shall, by his or its execution of this Agreement and as a condition to receiving any interest in the Partnership property, agree to be bound by the Project Documents to the same extent and in the same terms as the other Limited Partners.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710060

JAE-AMTAX00000351

C.     Upon the admission of any additional Limited Partners, an amendment to this Agreement and, if necessary or appropriate, the Certificate reflecting such admission shall be filed with each appropriate governmental authority. Such amendment shall amend the Schedule to reflect the names, addresses and Capital Contributions of such additional Limited Partners, and shall set forth the agreement of such additional Limited Partners to be bound by all the provisions of this Agreement.

## ARTICLE X
## LOANS

A.     All Partnership borrowings shall be subject to the restrictions of Section 7.1, this Article, the Project Documents and the Regulations. To the extent borrowings are permitted, they may be made from any source, including Partners and Affiliates. The Partnership may issue instruments evidencing Subordinated Loans pursuant to Section 7.9.

B.     If any Partner shall lend any monies to the Partnership, such loan shall be unsecured and the amount of any such loan shall not be an increase of its Capital Contribution. Until such time as the General Partners and the Developer shall have performed fully their obligations to furnish funds pursuant to Section 7.9 hereof and pursuant to the Development Agreement, any loan from a General Partner or an Affiliate of a General Partner shall be an obligation of the Partnership to the Partner or Affiliate only if it constitutes a borrowing permitted by Section 7.9 or pursuant to the Development Agreement and shall be repayable as therein provided. Subject to the preceding, any loans to the Partnership by a General Partner or an Affiliate of a General Partner may be made on such terms and conditions as may be agreed on by the Partnership, consistent with good business practices.

## ARTICLE XI
## MANAGEMENT AGENT

A.     Subject to the consent of the Investment Company, the Managing General Partner shall have responsibility for obtaining a Management Agent acceptable to each Lender and Agency to manage the Project in accordance with the requirements of each Lender and Agency. The Managing General Partner shall cause the Partnership to enter into the Management Agreement with the Management Agent, which may be an Affiliate of a General Partner. Subject to the Regulations, the Management Agent shall be entitled to receive a reasonable and competitive Management Fee (determined by reference to arm's-length property management arrangements for comparable properties in force in the general locality of the Project) not to exceed the lesser of 3.75% of net rental income or the maximum amount permitted by each Agency, Lender or HUD. If at any time after the Completion Date:

(i)     The Project shall be subject to a substantial building code violation or violations which shall not have been cured within 90 days after notice from the applicable governmental agency or department or unless such violation(s) is (are) being validly contested by the General Partner by proceedings which operate to prevent any fines or criminal penalties from being levied against the Partnership or unless in the case of any such violation not susceptible of cure within such 90-day period, the Managing General Partner is diligently making reasonable efforts to cure the same,

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710061

JAE-AMTAX00000352

(ii)     Operating revenues of the Project in respect of any period of 24 consecutive calendar months after the Completion Date shall be insufficient to permit the Partnership to pay when due on a current basis all Partnership obligations in respect of such 24-month period,

(iii)     The representation and warranty set forth in Section 7.5A(xi) cannot be accurately made or a Recapture Event shall have occurred,

(iv)     The Management Agent or its agents or employees have demonstrated incompetence or malfeasance in the management of the Project,

(v)     The Management Agent shall fail to provide the required information to the General Partner in a timely manner to permit the Managing General Partner to make all reports required by Article XII when due,

(vi)     An Event of Bankruptcy shall occur with respect to the Management Agent,

(vii)     The Management Agent shall take any action or omit to take any action which violates in any material respect the terms of the Project Documents or any local, state or federal law applicable to the Project, or

(viii)     The Management Agent is an Affiliate of a General Partner and the General Partner is removed as such under the terms of this Agreement.

Then, in any such event, the Managing General Partner shall forthwith give to the Partners notice of such event, and thereafter the Partnership shall, subject to any Requisite Approvals, forthwith terminate its management agreement with the Management Agent, unless the approval of the Investor Limited Partner is obtained to the retention of the Management Agent as the manager of the Property. If such approval is not so obtained, the Managing General Partner shall immediately proceed to select a qualified Person (which, in the event the terminated Management Agent was an Affiliate of the General Partners, shall be unaffiliated with any General Partner) as the new Management Agent for the Property, which selection shall be subject to any Requisite Approvals including approval of the Investment Company; and, after such selection, no Management Fee shall be payable to any Person which is an Affiliate of a General Partner unless the management contract with any such Person shall provide for the right of the Partnership to terminate the same upon the occurrence of the circumstance described in this Article XI.

## ARTICLE XII
### BOOKS AND REPORTING, ACCOUNTING, TAX ELECTIONS, ETC.

Section 12.1     Books, Records and Reporting

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710062

JAE-AMTAX00000353

A.     The General Partners shall keep or cause to be kept:

(i)     A complete and accurate set of books and supporting documentation of transactions with respect to the conduct of the Partnership's business. The books of the Partnership shall be kept on the accrual basis. The books and records of the Partnership (including all records required to be maintained under the Uniform Act) shall at all times be maintained at the principal office of the Partnership. Each of the Partners and their duly authorized representatives shall have the right to examine the books of the Partnership and all other records and information concerning the operation of the Property at reasonable times.

(ii)     Prior to Final Closing, and within five (5) days of submission to the Lender, the General Partners shall cause to be distributed to the Limited Partner copies of the monthly draws of the Construction Loan along with copies of all change orders prior to each such draw, copy of the Certificate of Occupancy, if any is required to be obtained by the governmental authority having jurisdiction, copy of the Architect's Certificate of Compliance and a copy of an Insurance Binder listing the Limited Partner as an additional party to be notified as to any changes to the policy. Within fifteen (15) days of the closing thereto, the Managing General Partner shall also provide to the Investor Limited Partner copies of all documents for the Permanent Mortgage Loan.

B.     The General Partners shall cause to be prepared and distributed to all persons who were Partners at any time during a fiscal year of the Partnership:

(i)     Within thirty (30) days of the Completion Date, a Credit Basis Worksheet for each building of the Apartment Complex, in a form as specified by the Investment Company.

(ii)     By March 1 of each calendar year, and with respect to the previous fiscal year of the Partnership, an audited financial statement which includes (A) a balance sheet as of the end of such fiscal year and statements of income, Partners' equity, and changes in financial position and a Cash Flow statement, for the year then ended, all of which, shall be prepared in accordance with generally accepted accounting principles and accompanied by an auditor's report containing an opinion of the Accountants (however, no audit shall be necessary if there is less than one quarter in which the Project has occupancy for such year), and (B) a report of the activities of the Partnership during the period covered by the report. Such report shall set forth distributions to Limited Partners for the period covered thereby and shall separately identify distributions from: (1) Cash Flow from operations during the periods, (2) Cash flow from operations during a prior period which had been held as reserves, (3) proceeds from disposition of the Apartment Complex or any other investments of the Partnership, (4) lease payments on net leases with builders and sellers, (5) costs reimbursed to any General Partner and its Affiliates verified by an accountant's review of time records and the specific nature of the work, (6) reserves, (7) borrowed monies, loans and additional contributions and (8) transactions outside of the ordinary course of business with a description thereof.

(iii)     By February 15 of each calendar year, and with respect to the previous fiscal year of the Partnership, (A) all information necessary for the preparation of the

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710063

JAE-AMTAX00000354

Limited Partners' federal income tax returns, (B) a qualifying occupancy summary in a format acceptable to the Investment Company.

 (iv) Within fifteen (15) days of the end of each month for the first year and each quarter thereafter, low income housing credit monitoring form, rent rolls, statement of income and expenses, operating statement and occupancy/rental report, all in the form specified or approved by the Investment Company. Copies of the bank statements for all Reserve and Escrow accounts are also to be provided at these times.

 (v) Within thirty (30) days after the end of each quarter of each fiscal year of the Partnership, a report containing:

  (1) A balance sheet, which may be unaudited;

  (2) A statement of income for the quarter then ended, which may be unaudited;

  (3) A statement of cash flows, which may be unaudited;

  (4) The certification by the General Partners that the Apartment Complex and all tenants thereof are in compliance with all requirements and regulations applicable to Federal Housing Tax Credits; and

  (5) Other pertinent information regarding the Partnership and its activities during the quarter covered by the report.

 (vi) Immediately upon being informed thereof, written notice of any IRS, Tax Credit Agency, or local municipality audits, investigations, official inquiries, or notices relating to, or arising from, alleged non-compliance or alleged violations of law, regulations, rules or codes.

 (vii) As soon as practicable, copies of all correspondence between the General Partners, and/or Management Company, and either the Agency or the Service, with regard to this Project.

 C. Within sixty (60) days after the end of each fiscal year of the Partnership the General Partners shall cause to be provided to the Investment Company:

 (i) A statement by the General Partners, to the best of their knowledge, that (A) all Construction Loan and/or Mortgage Loan payments and taxes and insurance payments with respect to the Apartment Complex are current as of the date thereof, or if there is any default, a description thereof, and (B) there is no building, health or fire code violation or similar violation of a governmental law, ordinance or regulation against the Apartment Complex or of which the General Partners have received notice or have actual knowledge, if there is any violation received, a description thereof;

 (ii) [Intentionally Omitted];

New D\Victoria Heights\LP.6

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710064

JAE-AMTAX00000355

(iii)   A descriptive statement of all material transactions during the fiscal year between the Partnership and each General Partner and/or any Affiliate, including the nature of the transaction and the payments involved; and

(iv)   A copy of the annual report to be filed with the United States Treasury concerning the status of the Apartment Complex as low-income housing and, if required, a certificate to the Credit Agency concerning the same.

D.   Upon the reasonable written request of the Investment Company for further information with respect to any matter covered in items B or C above, the General Partners shall cause to be furnished such reasonable information within 30 days of receipt of such request. The General Partners, on behalf of the Partnership, shall cause to be sent to the Investment Company, copies of complete first year tenant files within thirty (30) days of each tenant's initial occupancy date or within thirty (30) days form the placed-in-service date in the case of an occupied unit with rehabilitated property.  The General Partners shall provide the Investment Company with current photographs and/or slides of the apartment complex upon request.

E.   The General Partners, on behalf of the Partnership, shall case to be sent to the Investment Company, on or before July 31 in each year, a report which shall state:

(i)   The then occupancy level of the Apartment Complex;

(ii)   If there are any operating deficits or anticipated operating deficits, the manner in which such deficits will be funded; and

(iii)   Such other matters as shall be material to the operation of the Partnership, including, without limitation, any building, health governmental law, ordinance or regulation by the Apartment Complex of which the General Partners, or any of them, is (are) aware.

F.   Prior to October 15 of each year, the General Partners, on behalf of the Partnership, shall cause to be sent to the Investment Company a current nine (9) month balance sheet, an estimate of the Investment Company's share of the Tax Credits by each building of the Property, estimate of total Tax Credits, and estimates of Profits and Losses for tax purposes of the fiscal year in a form as specified by the Investment Company. Such estimate shall be prepared by the General Partners and the Accountants.

G.   Within 15 days after the end of any calendar quarter during which:

(i)   There is a material default by the Partnership under the Project Documents or in payment of any mortgage, taxes, interest or other obligation on secured or unsecured debt,

(ii)   Any reserve (to the extent required under Section 7.8) has been reduced or terminated by application of funds therein for purposes materially different from those for which such reserves was established,

New D\Victoria Heights\LP.6                               61

JAE-AMTAX00000356

(iii)     The General Partners, or any of them, has (have) received any notice of a material fact which may substantially affect further distributions, or

(iv)     Any Partner has pledged or collateralized his or its Interest in the Partnership,

Then, the General Partners shall cause to be sent the Investment Company a detailed report of such event.

H.     After the Admission Date, the General Partners, on behalf of the Partnership, shall send to the Investment Company a copy of all applicable periodic reports covering the status of project operations from the previous period, as may be required by any Lender and/or Agency, as applicable.

I.     Failure to provide the reports required under Section 12.1 within the time requirements set forth therein shall result in the assessment of a $100 per day penalty due and payable to the Investor Limited Partner until the tax information and/or reports are received. These penalties (the "Report Penalties") will be waived if the required information is received within three (3) business days after receipt of a written notice of demand from the Investor Limited Partner (including a notice sent by facsimile). Regardless of whether the Report Penalties are paid, should the above applicable reporting requirements not be met, the Investor Limited Partner may require the removal of the Accountants and the right to approve a replacement.

J.     Special Report. Unless otherwise fully reported to the Investment Limited Partner pursuant to this Section 12.1, a special report must be issued within sixty (60) days after the end of each quarter for real property acquisitions. The report shall contain a description of properties acquired, the present or proposed use of such properties, lease terms, financing terms, title insurance and bonding information.

K.     Every Limited Partner shall at all times have access to the records of the Partnership and may inspect and copy any of them. A list of the names and addresses of all of the Limited Partners shall be maintained as part of the books and records of the Partnership and shall be mailed to any Limited Partner upon request. A reasonable charge for copy work may be charged by the Partnership.

Section 12.2     Bank Accounts

The bank accounts of the Partnership shall be maintained in such banking institutions as the General Partners shall determine with the approval of each Lender and Agency, and withdrawals shall be made only in the regular course of Partnership business on such signature or signatures as the General Partners shall determine.

Section 12.3     Elections

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710066

JAE-AMTAX00000357

Subject to the provisions of Section 12.4, all elections required or permitted to be made by the Partnership under the Code shall be made by the Managing General Partner in such manner as it considers to be most advantageous to the Limited Partners. [Notwithstanding the foregoing, however, unless the Consent of the Investor Limited Partner is obtained permitting a different cost recovery schedule, the Partnership shall depreciate its personal and real property utilizing the alternative depreciation system of Section 168(g)(2) of the Code.].

Section 12.4    Special Adjustments

In the event of a transfer of all or any part of the interest of any Partner or in the event an election pursuant to Section 754 of the Code (or corresponding provisions of succeeding law) is made by the Investment Company, the Partnership shall elect, if requested by the transferee or by the Investment Company (as the case may be), pursuant to Section 754 of the Code (or corresponding provisions of succeeding law) to adjust the basis of Partnership assets. Notwithstanding anything to the contrary contained in Article X, any adjustments made pursuant to said Section 754 shall affect only the successor in interest to the transferring Partner. Each Partner will furnish the Partnership with all information necessary to give effect to such election.

Section 12.5    Fiscal Year

The Fiscal Year of the Partnership shall be the calendar year unless some other year is required by the Code.

## ARTICLE XIII
## GENERAL PROVISIONS

Section 13.1    Notices

Except as otherwise specifically provided herein, all notices, demands or other communications hereunder shall be in writing and shall be deemed to have been given when the same are (i) deposited in the United States mail and sent by certified or registered mail, postage prepaid, (ii) deposited with Federal Express or similar overnight delivery service, (iii) transmitted by telecopier or other facsimile transmission, answerback requested, or (iv) delivered personally, in each case, to the parties at the addresses set forth below or at such other addresses as such parties may designate by notice to the Partnership:

A.    If to the Partnership, at the principal office of the Partnership set forth in Section 2.2.

B.    If to a Partner, at his or its address set forth in the Schedule.

Section 13.2    Word Meanings

The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. Any

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710067

JAE-AMTAX00000358

references to "Sections" or "Articles" are to Sections or Articles of this Agreement, unless reference is expressly made to a different document.

### Section 13.3  Binding Provisions

The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, successors and assignees of the respective parties hereto, except in each case as expressly provided to the contrary in this Agreement.

### Section 13.4  Applicable Law

This Agreement shall be construed and enforced in accordance with the internal laws of the State.

### Section 13.5  Counterparts

This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

### Section 13.6  Paragraph Titles

Paragraph titles and any table of contents herein are for descriptive purposes only, and shall not control or alter the meaning of this Agreement as set forth in the text.

### Section 13.7  Separability of Provisions; Rights and Remedies

A.      Each provision of this Agreement shall be considered separable and (i) if for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, or (ii) if for any reason any provision or provisions herein would cause the Limited Partners to be bound by the obligations of the Partnership under the laws of the State as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

B.      Each of the parties hereto irrevocably waives during the term of the Partnership (including any periods during which the business of the Partnership is continued under Article VIII) any right (i) that such party may have to maintain any action for partition with respect to the property of the Partnership, and (ii) any right to commence an action seeking dissolution of the Partnership (unless the Consent of the Investor Limited Partner has been obtained).

C.      The rights and remedies of any of the parties hereunder shall not be mutually exclusive, and the exercise of one or more of the provisions hereof shall not preclude the exercise of any other provisions hereof. Each of the parties confirms that damages at law may be an inadequate remedy for breach or threat of breach of any provisions hereof. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction, or other equitable remedy, but nothing herein contained is intended to limit or affect

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710068

JAE-AMTAX00000359

any rights at law or by statute or otherwise of any party aggrieved as against the other parties for a breach or threat of breach of any provision hereof, it being the intention by this paragraph to make clear that under this Agreement the respective rights and obligations of the Partners shall be enforceable in equity as well as at law or otherwise.

        D.    Each Partner irrevocably:

        (i)    Agrees that any suit, action or other legal proceeding arising out of this Agreement, any of the Related Agreements or any of the transactions contemplated hereby or thereby shall be brought in the courts of record of Riverside County of the State of California or the courts of the United States located in the Southern District of California;

        (ii)    Consents to the jurisdiction of each such court in any such suit, action or proceeding; and

        (iii)    Waives any objection which he or it may have to the laying of venue of any such suit, action or proceeding in any of such courts.

### Section 13.8    Effective Date of Admission

Any Partner admitted to the Partnership during any calendar month shall be deemed to have been admitted as of the first day of such calendar month for all purposes of this Agreement including the allocation of Profits, Losses and Tax Credits under Article VI; provided, however, that if regulations are issued by the Service or an amendment to the Code is adopted which would require, in the opinion of the Accountants, that a Partner be deemed admitted on a date other than as of the first day of such month, then the General Partners shall select a permitted admission date which is most favorable to the Partner.

### Section 13.9    Amendment Procedure

This Agreement may be amended by the written consent of each of the General Partners, and with the Consent of the Investor Limited Partner or in the manner provided in Section 4.5, subject to the following:

        (i)    The term of the Partnership shall not be extended beyond December 31, 2052 without the written approval of all Partners.

        (ii)    This Section 13.9 shall not be amended without the written approval of all Partners.

        (iii)    This Agreement shall not be modified or amended in such a manner as to increase the amount of Capital Contributions or reduce the interest of any Partner in Profits, Losses, Tax Credits, Cash Flow or Capital Proceeds of the Partnership or otherwise increase the liability of any Partner without the written approval of each Partner affected thereby.

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710069

JAE-AMTAX00000360

(iv)    Without the written approval of all Partners, no amendment hereof may reduce the percentage in interest of Partners required hereunder for the taking or omission of any action or for the consent to any action proposed to be taken or omitted.

(v)    Notwithstanding any agreement to the contrary contained in this Agreement, no amendment will be made to this Agreement which will affect the rights of any Lender or Agency under the terms of any Project Document without the prior written approval of such Lender or Agency.

(vi)    Article VI may be amended by the General Partners only with the prior written consent of the Investor Limited Partner.

Section 13.10  Delivery of Certificate

Promptly upon the filing of the Certificate and each amendment thereto in the Filing Office, the General Partners shall deliver or mail a copy thereof to each Limited Partner.

Section 13.11  Requirements of the Lender and the Agency

A.    For as long as any Mortgage from the Partnership held by the Lender shall be outstanding:

(i)    Each of the provisions of this Agreement shall be subject to, and the General Partners covenant to act in accordance with the Regulations and the Commitments, but in no event shall any Partner be personally liable for the performance of this covenant;

(ii)    The Regulations and the Commitments shall be binding upon and shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successors and assigns, but only to the extent expressly provided therein;

(iii)    Any Partner hereafter shall, as a condition of receiving an interest in the Partnership property, agree to be bound by the Commitments and other documents required in connection with the Mortgage Loan to the same extent and on the same terms as the other parties;

(iv)    Upon any dissolution of the Partnership or any transfer of the Property, no title to or right to the possession and control of the Property, and no right to collect the rent therefrom shall pass to any Person who is not or does not become bound by the Commitments (including, without limitation, the Regulatory Agreement) in a manner satisfactory to the Lender;

(v)    No amendment of this Agreement which would affect the rights of the Lenders under any of the documents referred to in this Section 13.11 shall be made without the prior written consent of the Lender;

(vi)    Any other provisions of this Agreement to the contrary notwithstanding, if any provisions of this Agreement shall be in conflict with any provisions of

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710070

JAE-AMTAX00000361

the Commitments (including, without limitation, the Regulatory Agreement), the provisions of the Commitments shall control;

(vii)   No distributions (as that term is defined in the Regulatory Agreement) shall be made except as permitted by the terms of the Regulatory Agreement;

(viii)   Any other provisions of this Agreement to be the contrary notwithstanding, fees for services payable to the Developer pursuant to the Development Agreement shall be payable only out of Capital Contributions or Surplus Cash (as such term Is defined in the Regulatory Agreement);

(ix)   The Partnership shall not be voluntarily dissolved without the prior written consent of the Lender; and

(x)   The provisions of this Section 13.11 shall not be deleted, amended or modified without the prior written consent of the Lender.

B.   In the event the Partnership elects to (a) pay off any loan that has been insured or coinsured and (b) refinance the Property with the proceeds of a new loan from a lender to be insured or coinsured, this provision shall remain operative unless modified at the request of said secretary or such lender.

Section 13.12   Entire Agreement

This Agreement, and the Related Agreements referred to herein sets forth all (and is intended by all parties to be an integration of all) of the representations, warranties, promises, agreements, and understandings of the parties hereto with respect to the Partnership, its Partners, its business and its properties; and there are no representations, warranties, promises, agreements or understandings, oral or written, express or implied, among them other than as set forth or incorporated by reference herein.

Section 13.13   Partition

No Partner nor any successor or assignee of any Partner has the right to partition the Project or any part thereof or interest therein, or file a complaint or institute an action or proceeding at law or in equity to partition the Project or any part thereof or interest therein. Each Partner for itself and its successor and assigns waives any such rights. The Partners intend that during the term of this Agreement, the rights of the Partners and their successors in interest, as among themselves, are governed solely by the Agreement and the Uniform Act.

Section 13.14   Representation of Parties

Each of the Limited Partners hereby acknowledges and agrees that Partnership Counsel is the initial counsel ("Initial Counsel") representing the Partnership and the General Partners and that Bronson & Migliaccio, LLP is the counsel representing the interests of the Investor Limited Partner and that the Initial Counsel does not represent, and shall not be deemed to represent under the applicable codes of professional responsibility to have represented or be representing, any or all of the Limited Partners in any respect at any time. In the event of any

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710071

JAE-AMTAX00000362

dispute or controversy between any Limited Partner and a General Partner, then each Limited Partner hereby agrees that the General Partner may be represented by the Initial Counsel in such dispute or controversy and each Limited Partner expressly consents to the Initial Counsel's representation of the General Partner.

Section 13.15   <u>Arbitration</u>

A.   <u>General; Appointment of Arbitrators; and Discovery</u>.

(i)   Except as otherwise specifically provided in this sub-paragraph (i), if any controversy or dispute between the parties hereto arises under, out of, or in relation to any of the provisions hereof, and this Agreement expressly provides for the arbitration of said controversy or dispute, which cannot be settled by the parties within fifteen (15) days after a party hereto gives written notice of the existence of such dispute, either party, within thirty (30) days of the expiration of the foregoing fifteen (15) day period, may submit such controversy or dispute for arbitration to, and in accordance with the Rules of Practice and Procedure for the Arbitration of Judicial Disputes of Judicial Arbitration & Mediation Services, Inc. ("J.A.M.S.") (J.A.M.S. and its agents are referred to herein as the "Arbitrators"), as then in effect, except as otherwise provided by the provisions of this Paragraph 13.15A(i).

(ii)   The provisions of this Paragraph 13.15A(ii) shall not be construed to deny any party the right to seek provisional remedies available to said party before a court of law. For the purposes of this Agreement, the parties, by submitting the controversy or dispute to the Arbitrators, do not waive or relinquish their rights to seek provisional remedies before a court of law and said parties expressly agree that each party shall have the right to seek provisional remedies before a court of law.

(iii)   If neither party elects to submit a controversy to arbitration within the aforesaid thirty (30) day period, then either party shall have the right to commence legal proceedings to resolve the controversy; provided, however, such party must first give written notice to the other party of its intent to commence litigation and the party receiving such notice shall have fifteen (15) days following the date of receipt of such notice to submit the controversy to arbitration in accordance with the foregoing provisions of this Paragraph 13.15A(iii). If the party, after receiving such notice, does not submit the controversy to arbitration within such fifteen (15) day period, the right to arbitrate such noticed dispute shall be waived and then the party giving the notice shall have the right to commence legal proceedings to resolve the controversy without further notice or further obligation to comply with the provisions of this Paragraph 13.15A(iii) with respect to that particular controversy. For the purposes of this Agreement, the time within which any arbitration proceedings can be instituted with respect to any matter or dispute shall be deemed to have elapsed only upon the expiration of the aforesaid fifteen (15) day period following the receipt of such a notice of intent to commence legal proceedings. If either party refuses to submit to arbitration after duly given notice of the other parties exercise of his/her right to arbitrate, the other party shall be entitled to an order from the appropriate court compelling arbitration. If either party commences legal proceedings (and the other party does not successfully compel arbitration) to resolve the controversy as specifically provided in this Paragraph 13.15A(iii), the parties hereto shall stipulate immediately upon the

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710072

JAE-AMTAX00000363

setting of a trial date, pursuant to California Rule of Court 244, or any successor amended statute or law containing similar provisions, that the proceeding be tried by a temporary judge.

(iv)   The provisions of California Code of Civil Procedure governing discovery in civil litigation, or any successor amended statute or law containing similar provisions, are incorporated by reference herein and shall apply in any such arbitration; specifically, the parties shall have the right to engage in all pre-hearing discovery as that which would be permitted in a civil litigation action to resolve their dispute. The Arbitrator shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the same extent as a court of law, should the Arbitrator determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification. The parties shall have a certified court reporter make a record of the hearing. The arbitration shall proceed in accordance with the laws relating to arbitration then in effect in the State of California, including, but not limited to Sections 1280 through 1294.2 of the California Code of Civil Procedure, as the same may be amended or superseded from time to time.

B.   Final Judgment, Findings of Fact and Conclusions.

(i)   The Arbitrator shall apply California law as though he/she was bound by applicable statutes and precedents and case law, including the admissibility of evidence and shall endeavor to decide the controversy as though he/she were a judge in a California court of law. The Arbitrator shall have the power to issue any award, judgment, decree or order of relief that a court of law or equity could issue under California law, including, but not limited to, money damages, specific performance, or injunctive relief; and for such purposes, it is hereby expressly acknowledged and agreed that damages at law will be an inadequate remedy for a breach or threatened breach of any provision of this Agreement, it being the intention of this sentence to make clear the agreement of the parties that the respective rights and obligations of the parties hereunder shall be enforceable in any arbitration proceedings in accordance with principles of equity as well as law.

(ii)   The Arbitrator shall prepare a written decision that shall be supported by written findings of fact and conclusions which adequately set forth the basis of his/her decision and which cite the statutes and precedents applied and relied upon in reaching his/her decision. The award, judgment, decree or order, and the findings of the Arbitrator shall be final, conclusive and binding upon the parties, and judgment upon the award and enforcement of any other judgment, decree or order of relief granted by the Arbitrator may be entered or obtained in any court of competent jurisdiction upon the application of any party. This agreement to arbitrate shall be self-executing without the necessity of filing any action in any court and shall be specifically enforceable under the prevailing arbitration law.

C.   Costs and Expenses. Except as otherwise provided in Paragraph 13.15A(iv) in the provisions related to discovery, all costs and expenses of any arbitration proceeding hereunder, excluding attorneys' fees, shall be shared equally by the parties. Each party shall bear its own attorneys' fees. Notwithstanding the foregoing, however, in the event the Arbitrator shall determine that a party acted without substantial justification in submitting to a dispute to arbitration, the party who is so determined to be acting without substantial justification

CB__ PARTNERSHIP AGREEMENT; 8-27-01_104710073

JAE-AMTAX00000364

shall bear all costs and expenses of the other party in the proceeding including, but not limited to, the reasonable attorneys' fees of such other party. The parties hereto expressly agree that the provisions of California Code of Civil Procedure, including, but not limited to, Section 998 et seq., as the same may be amended or superseded from time to time, governing offers by a party to compromise shall not apply to any arbitration proceeding hereunder.

Section 13.16   Requirements for Bonds

A.   Notwithstanding any other provision of this Agreement to the contrary, so long as any Bonds shall be outstanding, the Partnership shall not, and the General Partners shall have no authority in respect of the Partnership or the Project to, perform any act or permit any act to be taken on its behalf which:

(i)   Is contrary to or would result in a breach or violation of or a default under any requirement, covenant or other obligation of the Partnership set forth in any Bond document or;

(ii)   Would adversely affect the exemption from taxation under the Code of the interest paid on the Bonds.

B.   Not withstanding any other provision in the Agreement to the contrary, for so long as any Bonds shall be outstanding:

(i)   Each of the provisions of this Agreement shall be subject to, and the General Partners covenant to act in accordance with, the Bond Documents but in no event shall any Partner be personally liable for the performance of this covenant.

(ii)   No amendment of this Agreement which would affect the rights of any party to any Bond Document (other than the Partnership) shall be made without the prior written consent of such party and without prior compliance with the conditions for amending such Bond Document;

(iii)   If any provision if this Agreement shall be in conflict with any provision of any Bond Document, such conflicting provision of this Agreement shall be suspended and the provisions of the Bond Document shall control;

(iv)   No part of the Project will be sold or otherwise disposed of or leased and no change in the use of the Project shall be made, except in accordance with the terms and conditions of the Bond Documents;

(v)   The Partnership shall not change or permit any change in its identity or ownership (except for admitting additional limited partners), undertake any other obligations, directly or indirectly, or take or permit any other actions which would impair or prevent performance of its obligations, except as permitted thereby, without obtaining the requisite approvals under the Bond Documents;

(vi)   To the extent reasonably possible, the Partners shall take all actions necessary to amend this Agreement to comply with any amendments to the Code or the Treasury Regulations

New D\Victoria Heights\LP.6                                      70

effective retroactive to the date of such changes that are applicable to the exemptions of federal taxation under the Code of the interest paid on the Bonds; and

(vii)    The provisions of this Section 13.16 shall not be deleted, amended or modified without the prior written consent of the parties to the Bond Documents.

## ARTICLE XIV

### Provisions Regarding FHA Financing

The provisions of this Article 14 shall be applicable only during such period of time as the Note (as defined below) is either insured or held by the Secretary, his successors and assigns (the "Secretary") of the United States Department of Housing and Urban Development ("HUD" or "FHA") acting by and through the Federal Housing commissioner.

Section 14.1    Authorization and Execution of Documents

The Partnership intends to obtain a mortgage loan (the "Mortgage Loan") to be insured by the Secretary under Sections 207 pursuant to Section 223(f) of the National Housing Act, as amended, with respect to a multifamily rental apartment projects located in Riverside County, Riverside, California, known as Lincoln Apartments and identified among the records of HUD as FHA Project No. 143-11051-PM/REF (the "Project"). The Partnership is authorized and empowered to execute a Regulatory Agreement with the Secretary, a non-recourse promissory note (the "Note"), a mortgage, deed of trust, security deed or equivalent instrument (the "Mortgage"), a security agreement, financing statements, contracts, assurances, agreements, certifications and other documents required in connection with the HUD-insured loan (hereinafter collectively called the "FHA Loan Documents") and to execute such other documents and to take such actions as may be necessary, desirable or appropriate to secure closing and funding of the Mortgage Loan.

Section 14.2    Business of Partnership

So long as the Note is insured or held by the Secretary, the sole business, purpose and asset of the Partnership shall be the ownership and operation of the Project.

Section 14.3    Conflicts

(a)    In the event of a conflict between any of the provisions of this Partnership Agreement and any of the FHA Loan Documents, the FHA Loan documents shall govern and be controlling in all respects.

(b)    In the event of a conflict between any other provisions of this Partnership Agreement and this Article 14, this Article 14 shall govern and be controlling in all respects.

Section 14.4    Liability of Partners under Regulatory Agreement

The Partners, and any assignee of a Partner, shall be liable to HUD under the Regulatory

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710075

JAE-AMTAX00000366

Agreement in their individual capacities with respect to the following matters;

(a)     For funds or property of the Project coming into their hands, which by the provisions of the Regulatory Agreement, they are not entitled to retain;

(b)     For their own acts and deeds, or the acts and deeds of others, which they have authorized, in violation of the provisions of the Regulatory Agreement;

(c)     For the acts and deeds of affiliates, as defined in the Regulatory Agreement, which the person or entity has authorized in violation of the provisions of the Regulatory Agreement; and

(d)     As otherwise provided by law.

Section 14.5     Transfers of Partnership Interests

(a)     Any incoming Partner shall, as a condition of receiving any interest in the Partnership, agree to be bound by the Note, the Mortgage, the Regulatory Agreement and the FHA Loan Documents to the same extent and on the same terms as the other Partners.

(b)     A General Partner shall not change, convert or transfer his, her or its general partnership interest to a limited liability company without the prior written consent of HUD.

(c)     Any Partner becoming either a General Partner or a Limited Partner with a partnership interest of twenty-five percent (25%) or greater must meet applicable previous participation clearance requirements of HUD and receive written approval from HUD prior to the transfer of such interest or assumption of such position in the Partnership.

Section 14.6     Dissolution

(a)     The Partnership may not be voluntarily dissolved or changed to a different type of entity without the prior written approval of HUD.

(b)     No act of voluntary dissolution of the Partnership shall operate to affect or relieve the Partnership of obligations under the Regulatory Agreement until a successor owner has been approved by HUD.

(c)     Upon any dissolution of the Partnership, no title or right to possession and control of the Project, and no right to collect the rents from the Project, shall pass to any person or entity who is not bound by the Regulatory Agreement in a manner satisfactory to the secretary.

Section 14.7     Compensation and Distributions of Project Funds

So long as the Note is insured or held by the Secretary;

(a)     The Partnership shall not make, nor shall any Partner receive and retain, any

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710076

JAE-AMTAX00000367

distribution of assets or income of any kind of the Project except from Surplus Cash and in accordance with Paragraph 6 of the Regulatory Agreement; and

(b)     The HUD financial requirements as to cash controls and distributions as set forth in Paragraph 6 of the Regulatory Agreement shall supersede to the extent they are in conflict with any of the financial provisions of this Partnership Agreement.

Section 14.8   Designation of Authorized Representative

(a)     The Partnership hereby designates the individual(s) listed below as the official representative(s) for all matters concerning the Project which require HUD consent or approval, and the signature of this person(s) shall bind the Partnership in all such matters. The name current street address and telephone for the foregoing official representatives are as follows:

> Christina Alley, Chief Executive Officer and/or
> Mitchell C. Sperling, Secretary
> Central Valley Coalition for Affordable Housing
> and
> Edmund Johnson, President/CEO
> JAE Properties, Inc.

(b)     The name, address and telephone number of any additional Partners vested with management authority in matters pertaining to the Project are listed below:

None

(c)     The Partnership may from time to time appoint one or more new official representatives to perform such functions, but within three (3) business days of doing so, shall provide HUD with written notification of the name, address and telephone number of its new representative(s).

Section 14.9   Amendments

So long as the Note is insured or held by the Secretary, no amendment to this Partnership Agreement which results in any of the following shall be of any force or effect without prior written consent of HUD;

(a)     Any amendment that modifies the duration of the Partnership Agreement;

(b)     Any amendment that activates the requirement that a HUD Previous Participation Certification be obtained for any additional or new Partner.

(c)     Any amendment that in any way affects the Note, the Mortgage, or security agreement applicable to the Project, or the Regulatory Agreement;

(e)     (d)     Any amendment that would authorize any Partner other than the General Partners

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710077

JAE-AMTAX00000368

or pre-approved successor General Partner(s) to bind the Partnership for all matters concerning the Project or Property which require HUD's consent or approval;

(e)     A change in the General Partner(s) or pre-approved successor General Partner(s) of the Partnership;

(f)     Any amendment to a provision required by HUD to be inserted in this Agreement; and

(g)     The deletion of, or any amendment to, this Article 14.

Section 14.10  <u>Automatic Termination</u>

This Article 14 shall automatically terminate, without further amendment to this Agreement, as such time as the Mortgage Loan for the Project is no longer held or insured by HUD.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

JAE-AMTAX00000369

## VICTORIA HEIGHTS, LTD.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**MANAGING GENERAL PARTNER:**          **SPECIAL LIMITED PARTNER:**

CENTRAL VALLEY COALITION FOR           PROTECH 2001-B, LLC
AFFORDABLE HOUSING, a California
nonprofit corporation

By: _Christina Alley_                  By: _____
 Its: _Chief Executive Officer_         Its: _President_

**CO-GENERAL PARTNER:**

JAE PROPERTIES, INC.

By: _____
 Its: _President_

**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 2001-XX, LLC

By:   PARAMOUNT PROPERTIES, INC.,
      its Manager

By: _____
 Its: _President_

**ORIGINAL (AND WITHDRAWING)
LIMITED PARTNERS:**

_____
MANFORD FORKNER

75

New P\Victoria Heights\LP 6.doc

JAE-AMTAX00000370

## VICTORIA HEIGHTS, LTD.
### SCHEDULE A

| Name and Business Address | Original Initial Capital Contributions | Percentage Interests |
|---|---|---|
| GENERAL PARTNERS: | | |
| Central Valley Coalition For Affordable Housing 33339 M Street Merced, CA 95348 | $ 935[1] | .0495% |
| JAE Properties, Inc. 7700 Edgewater Drive Oakland, CA 94621 | $ 935[1] | .0495% |
| SPECIAL LIMITRED PARTNER: | | |
| Protech 2001-B, LLC 3825 Columbus Rd., S.W., Bldg. F Granville, OH 18423 | $ 19 | .001% |
| INVESTOR LIMITED PARTNER: | | |
| AMTAX Holdings 2001-XX, LLC 3825 Columbus Rd., S.W., Bldg. F Granville, OH 18423 | $1,886,264[2] | 99.9% |
| TOTAL | $1,888,153 | 100% |

(1)    In the event any deferred portion of the Developer Fee is still outstanding prior to the end of ten (10) years of the Compliance Period, the Co-General Partner or Managing General Partner shall make an additional Capital Contribution to the Partnership in an amount equal to such outstanding amount, prior to the end of such tenth year. Such additional Capital Contribution shall be used solely to pay the outstanding deferred Developer Fee. Such Capital Contribution shall be returned to the Co-General Partner out of Distributions of Cash Flow or proceeds from a Sale or Refinancing in the same priority, but prior to, the repayment of Subordinated Loans of the Managing General Partner.

(2)    $1,131,759 has been paid in as if the date of the Investment Closing; An additional $754,505 to be paid pursuant to Article V, subject to an adjustment and conditions to payments provided herein.

CB__ PARTNERSHIP AGREEMENT; 8-27-01_104710080

JAE-AMTAX00000371

VICTORIA HEIGHTS, LTD.

<u>EXHIBIT 1</u>
**FORM OF**
**INSTALLMENT PAYMENT CERTIFICATE**

The undersigned, constituting of the managing general partner (the "Co-General Partner") of VICTORIA HEIGHTS, LTD., a California limited partnership (the "Partnership"), does hereby certify to AMTAX HOLDINGS 2001-XX, LLC, an Ohio limited liability company ("AMTAX"), pursuant to Section 5.1B(i) of the Amended and Restated Agreement of Limited Partnership of the Partnership, dated effective as of _____ (the "Partnership Agreement"), that:

1.    All preconditions, representations, warranties and agreements set forth in the Partnership and applicable to the [First, Second, Third, Fourth] Installment(s) have been satisfied.

2.    As set forth in Section 5.1A of the Partnership Agreement, the amount of the [First, Second, Third, Fourth] Installment is [$_____, $_____, $_____ and $_____, respectively.]

3.    All of the events listed in Section 5.1A (1) have occurred.

4.    Each of the representations and warranties set forth the Partnership Agreement, including those set forth in Section 7.5, is in all material respects true and correct.

5.    No event has occurred which would permit AMTAX to give an Election Notice under the Purchase Agreement.

6.    No event has occurred which suspends or terminates the obligations of the Investment Member to pay Installments under the Operating Agreement which has not been cured as therein provided.

7.    In the case of the [First, Second, Third, Fourth] Installment(s), attached hereto is a true copy of the Title Policy, including all endorsements thereto (the most recent of which is dated within 10 days of the date hereof), evidencing the accuracy of the representation contained in Section 7.5A (vi) of the Partnership Agreement.

Capitalized terms not defined herein shall have the meanings given to them in the Partnership Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate this ___ day of _____, 200_

New D\Victoria Heights\LP.6

JAE-AMTAX00000372

**SCHEDULE B**

Specified Tax Benefits
(to the Investment Company)

| Year | Annual Low Income Credits | Annual Tax Losses (Gains) |
|------|---------------------------|---------------------------|
| 2001 |         | 44,417  |
| 2002 | 228,003 | 171,966 |
| 2003 | 235,783 | 201,704 |
| 2004 | 235,783 | 189,680 |
| 2005 | 235,783 | 190,479 |
| 2006 | 235,783 | 138,782 |
| 2007 | 235,783 | 113,985 |
| 2008 | 235,783 | 140,120 |
| 2009 | 235,783 | 150,367 |
| 2010 | 235,783 | 149,154 |
| 2011 | 235,783 | 163,017 |
| 2012 | 7,780   | 125,518 |
| 2013 |         | 98,906  |
| 2014 |         | 134,585 |
| 2015 |         | 94,235  |
| 2016 |         | 86,502  |

New D\Victoria Heights\LP.6

**SCHEDULE B**

Specified Tax Benefits
(to the Investment Company)

| Year | Annual Low Income Credits | Annual Tax Losses (Gains) |
|------|---------------------------|---------------------------|
| 2001 |         | 44,417  |
| 2002 | 228,003 | 171,966 |
| 2003 | 235,783 | 201,704 |
| 2004 | 235,783 | 189,680 |
| 2005 | 235,783 | 190,479 |
| 2006 | 235,783 | 138,782 |
| 2007 | 235,783 | 113,985 |
| 2008 | 235,783 | 140,120 |
| 2009 | 235,783 | 150,367 |
| 2010 | 235,783 | 149,154 |
| 2011 | 235,783 | 163,017 |
| 2012 | 7,780   | 125,518 |
| 2013 |         | 98,906  |
| 2014 |         | 134,585 |
| 2015 |         | 94,235  |
| 2016 |         | 86,502  |

CB__PARTNERSHIP AGREEMENT; 8-27-01_104710083

JAE-AMTAX00000374

VICTORIA HEIGHTS, LTD.

EXHIBIT 1
FORM OF
INSTALLMENT PAYMENT CERTIFICATE

The undersigned, constituting of the managing general partner (the "Co-General Partner") of VICTORIA HEIGHTS, LTD., a California limited partnership (the "Partnership"), does hereby certify to AMTAX HOLDINGS 2001-XX, LLC, an Ohio limited liability company ("AMTAX"), pursuant to Section 5.1B(i) of the Amended and Restated Agreement of Limited Partnership of the Partnership, dated effective as of *Aug. 27, 2001* (the "Partnership Agreement"), that:

1.      All preconditions, representations, warranties and agreements set forth in the Partnership and applicable to the [First, Second, Third, Fourth] Installment(s) have been satisfied.

2.      As set forth in Section 5.1A of the Partnership Agreement, the amount of the [First, Second, Third, Fourth] Installment is [$ *1,131,759*, $_____, $_____ and $_____, respectively.]

3.      All of the events listed in Section 5.1A (1) have occurred.

4.      Each of the representations and warranties set forth the Partnership Agreement, including those set forth in Section 7.5, is in all material respects true and correct.

5.      No event has occurred which would permit AMTAX to give an Election Notice under the Purchase Agreement.

6.      No event has occurred which suspends or terminates the obligations of the Investment Member to pay Installments under the Operating Agreement which has not been cured as therein provided.

7.      In the case of the [First, Second, Third, Fourth] Installment(s), attached hereto is a true copy of the Title Policy, including all endorsements thereto (the most recent of which is dated within 10 days of the date hereof), evidencing the accuracy of the representation contained in Section 7.5A (vi) of the Partnership Agreement.

Capitalized terms not defined herein shall have the meanings given to them in the Partnership Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate this *28* day of *August*, 200*1*.

New D\Victoria Heights\LP.6.doc

JAE-AMTAX00000375

# VICTORIA HEIGHTS, LTD.

**IN WITNESS WHEREOF,** the parties have executed this form of installment payment certificate as of the day and year first above written.

<u>**MANAGING GENERAL PARTNER:**</u>

CENTRAL VALLEY COALITION FOR
AFFORDABLE HOUSING, a California
Nonprofit public benefit corporation

By: _____
Christina Alley,
Chief Executive Officer

<u>**CO-GENERAL PARTNER:**</u>

JAE Properties, Inc.

By: _____
Edmund Johnson,
President

State of California          )
                             ) ss.
County of Los Angeles        )

On this 28th day of August, 2001, before me, the undersigned, a notary public in and for said state, personally appeared _____ Christina Alley and Edmund Johnson _____ ,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature

C. Estandian
(print name)

C. ESTANDIAN
COMM. # 1210012
NOTARY PUBLIC-CALIFORNIA
City & County of San Francisco
COMM. EXP. FEB. 17, 2003

# VICTORIA HEIGHTS, LTD.
## A CALIFORNIA LIMITED PARTNERSHIP

## FIRST AMENDMENT TO THE
## AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP

**THIS FIRST AMENDMENT TO THE AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP** (this "**Amendment**") of **VICTORIA HEIGHTS, LTD.**, a California limited partnership (the "**Partnership**"), is made effective as of **July 24, 2012**, by and among Central Valley Coalition for Affordable Housing, a California nonprofit corporation (the "**Managing General Partner**"), Jae Properties, Inc., a California corporation (the "**Co-General Partner**"), AMTAX Holdings 2001-XX, LLC, an Ohio limited liability company (the "**Investor Limited Partner**"), Protech 2001-B, LLC, an Ohio limited liability company, as withdrawing Special Limited Partner ("**Protech**"), and Tax Credit Holdings VII, LLC, a Delaware limited liability company, as the substitute Special Limited Partner ("**TCH VII**").

### Recitals:

A.  The Managing General Partner, the Co-General Partner, the Investor Limited Partner and Protech have entered into that certain Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of August 27, 2001 (the "**Agreement**").

B.  As of the date hereof, Protech has assigned all of its right, title and interest in the Agreement to TCH VII.

C.  The purposes of this Amendment are (i) to effectuate the withdrawal of Protech as the Special Limited Partner of the Partnership; and (ii) to admit TCH VII as the substitute Special Limited Partner of the Partnership.  Unless otherwise defined herein, terms used herein with initial capital letters shall have the same meanings assigned to such terms in the Agreement.

### Agreement:

In consideration of the foregoing and the mutual promises and covenants hereinafter contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Amendment, intending to be legally bound, hereby agree as follows:

1.      Protech hereby withdraws as the Special Limited Partner of the Partnership and shall have no further rights or obligations with respect to the Partnership from and after the date hereof.  By its execution of this Amendment, and in accordance with Sections 9.1, 9.2 and 9.3 of the Agreement, the Managing General Partner and the Co-General Partner hereby consent to (i) the withdrawal of Protech as the Special Limited Partner of the Partnership and (ii) the admission and appointment of TCH VII as the substitute Special Limited Partner of the

1

JAE-AMTAX00000377

Partnership. TCH VII shall have, from and after the date of this Amendment, solely and exclusively, all of the rights and obligations as Special Limited Partner under the Agreement. Upon execution of this Amendment, any references to the "Special Limited Partner" of the Partnership in the Agreement shall mean and refer solely to TCH VII and shall specifically exclude Protech.

2.      The Agreement is hereby amended by replacing Protech with TCH VII in Schedule A of the Agreement and TCH VII shall succeed to the Capital Contributions made by Protech.

3.      All the provisions of this Amendment shall be deemed to be incorporated in, and made part of, the Agreement, as further amended by this Amendment, and the Agreement and this Amendment shall be read, taken and construed as one and the same instrument. Except as expressly set forth herein, this Amendment shall not by implication or otherwise limit, impair, constitute a waiver of, or otherwise affect the rights and remedies of any of the parties hereto under the Agreement, nor alter, modify, amend or in any way affect the terms, conditions, covenants or agreements contained in the Agreement, all of which are hereby ratified and affirmed in all respects by each of the parties hereto and shall continue in full force and effect. This Amendment shall apply and be effective only with respect to the provisions of the Agreement specifically referred to herein and any references in the Agreement to the provisions of the Agreement specifically referred to herein shall be to such provisions as amended by this Amendment.

4.      Each of the parties covenants that it will execute all documents and take such other actions as may be reasonably required or appropriate to effect the withdrawal of Protech as Special Limited Partner of the Partnership and the admission of TCH VII as the substitute Special Limited Partner, and to otherwise carry out the intent and purposes of this Amendment.

5.      This Amendment may be executed by the parties hereto in separate counterparts and any single counterpart or set of counterparts executed and delivered by all the parties shall together constitute one and the same instrument. The parties hereto may execute this Amendment by signing any such counterpart and any such signed counterpart of this Amendment may be delivered by telecopy with the same force and effect as if it were physically delivered.

**[THE REMAINDER OF THIS PAGE INTENTIONALLY BLANK]**

2

JAE-AMTAX00000378

IN WITNESS WHEREOF, the parties have duly executed this Amendment as of the day and year set forth above.

**MANAGING GENERAL PARTNER:**

CENTRAL VALLEY COALITION FOR
AFFORDABLE HOUSING

By: _Christina Alley_

Name: Christina Alley

Title: Chief Executive Officer

**CO-GENERAL PARTNER:**

JAE PROPERTIES, INC.

By: _(signature)_

Name: Edmund Johnson

Title: President

**PROTECH:**

PROTECH 2001-B, LLC

By: Protech Development Corporation, its Manager

By: _Alyssa Brzedzinski_

Name: Alyssa J. Brzedzinski

Title: Vice President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

3

JAE-AMTAX00000379

**TCH VII:**

TAX CREDIT HOLDINGS VII, LLC

By: HCP Pacific Holdings, LLC, its sole Member

By: HCP Pacific, LLC, its sole Member

By: Hunt Capital Partners, LLC, its Manager

By: _____

        Alan Fair, President

**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 2001-XX, LLC

By: Tax Credit Holdings VII, LLC, its Manager

By: HCP Pacific Holdings, LLC, its sole Member

By: HCP Pacific, LLC, its sole Member

By: Hunt Capital Partners, LLC, its Manager

By: _____

        Alan Fair, President

4

JAE-AMTAX00000380

# AMENDMENT TO

## AMENDED AND RESTATED

## AGREEMENT OF LIMITED PARTNERSHIP

### OF

## VICTORIA HEIGHTS, LTD.
### (a California limited partnership)

The undersigned hereby amend the Amended and Restated Agreement of Limited Partnership of **VICTORIA HEIGHTS, LTD.** (the "Partnership"), dated effective as of August 27, 2001 (the "Partnership Agreement"), and state as follows:

        1.     Pursuant to Section 13.9 and Section 4.5 of the Partnership Agreement, this Amendment changes, amends and modifies the Partnership Agreement as of the date hereof as set forth herein and incorporates all prior changes to the terms, conditions and provisions of the Partnership Agreement. All other provisions of the Partnership Agreement not changed herein, remain the same.

        2.     Article V, Capital Contributions of Investor Limited Partner, is amended at Section 5.2, Adjustments to Capital Contributions, at subsection C. Section 5.2 C is amended in its entirety and shall now read as follows:

        C.     Attached as Schedule B is a Schedule of Specified Tax Benefits that were calculated based upon projections provided by the General Partners and which constitute a substantial portion of the Investment Company's expected return. If, prior to funding the First Installment of Capital Contribution and once again prior to funding the Fourth Installment, the Investment Company determines that the Specified Tax Benefits are not achievable due to inaccuracies contained within or modifications to the underlying assumptions contained within the projections provided by the General Partners, the parties agree to amend the Investment Company's Capital Contribution to provide the Investment Company with a return that is consistent with the return contemplated by the Specified Tax Benefits.

[Remainder of this page intentionally left blank]

JAE-AMTAX00000381

OCT 17 2003 13:38 FR                         7405877425 TO 17077472666        P.03/03

## VICTORIA HEIGHTS, LTD.

### AMENDMENT SIGNATURE PAGE

IN WITNESS WHEREOF, the parties have executed this Amendment to the Amended and Restated Agreement of Limited Partnership to be effective as of the 27th day of August, 2001.

**MANAGING GENERAL PARTNER:**

CENTRAL VALLEY COALITION FOR
AFFORDABLE HOUSING, a California
nonprofit corporation

By:_____
    Its:_____

**CO-GENERAL PARTNER:**

JAE PROPERTIES, INC.

By:_____
    Its:___General Partner___

**INVESTOR LIMITED PARTNER:**

AMTAX HOLDINGS 2001-XX, LLC

By:    PARAMOUNT PROPERTIES, INC.,
    its Manager

    By:_____
        Its:_____

**SPECIAL LIMITED PARTNER:**

PROTECH 2001-B, LLC

By:_____
    Its:_____

A:\Amendment\Victoria Heights l

JAE-AMTAX00000382

# Paramount Financial Group, Inc.

4009 Columbus Road SW
Granville, OH 43023

## FACSIMILE COVER SHEET

TO: _Edmund Johnson_

COMPANY: _JAE Properties_

FAX NUMBER: _707- 747-2868_

DATE: _10/17/03_

FROM: _Pan_

SENDER'S PHONE: _7403217147_ SENDER'S FAX: _7403219747_

RE: _____

PAGES INCLUDING COVER SHEET: _3_

COMMENTS:
_Please sign and fax back-_
_I will foward originals via_
_mail_
_Thank you_
_Pan_

THE INFORMATION CONTAINED IN THIS FACSIMILE TRANSMISSION IS CONFIDENTIAL AND INTENDED ONLY FOR THE USE OF THE INDIVIDUAL NAMED ABOVE.   THIS FACSIMILE MAY NOT BE DISSEMINATED, DISTRIBUTED OR COPIED BY ANYONE OTHER THAN THE INDIVIDUAL NAMED ABOVE. IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE NOTIFY THE SENDER IMMEDIATELY BY CALLING THE SENDER'S PHONE NUMBER.  THANK YOU FOR YOUR COOPERATION.

JAE-AMTAX00000383

## Debbie Lyons - OH

| | |
|---|---|
| **From:** | RoxAnne Pickett - CO |
| **Sent:** | Wednesday, June 20, 2007 6:54 PM |
| **To:** | Data Connection - OH |
| **Cc:** | Ronald Hutchison - CA |
| **Subject:** | FW: LP amendment |
| **Attachments:** | Scan001.PDF |

Deb – this is an old amendment that the GP forwarded to me – This was to move the true up down. I did not see a copy on ideal.

Regards,

*RoxAnne Pickett*

Telephone: (303) 294-3217
Facsimile: (303) 291-5814
Cellular: (303) 229-5427

---

**From:** Edmund Johnson [mailto:ejohnson@jaeproperties.com]
**Sent:** Tuesday, May 01, 2007 2:17 PM
**To:** RoxAnne Pickett - CO
**Subject:** LP amendment

Roxanne,

Here's what I have.

Edmund Johnson

Begin forwarded message:

> **From:** jaeinc@sbcglobal.net
> **Date:** May 1, 2007 1:34:32 PM PDT
> **To:** "Edmund Johnson "<ejohnson@jaeproperties.com>
> **Cc: Subject: Scan from JAE Properties, Inc.**
> **Reply-To:** jaeinc@sbcglobal.net
>
> Please open the attached document. It was scanned and sent to you from JAE Properties.
>
> Sent by: Guest [jaeinc@sbcglobal.net]
> Number of Images: 3
> Attachment File Type: PDF
>
> WorkCentre Pro Location: machine location not set
> Device Name: WCP232
>
> For more information on Xerox products and solutions, please visit http://www.xerox.com

6/21/2007

JAE-AMTAX00000384